[No. S004712. Crim. No. 25432. July 13, 1992.]

THE PEOPLE, Plaintiff and Respondent, v.
RONALD AVERY McPETERS, Defendant and Appellant.

1152

## COUNSEL

Gary D. Sowards and Jean R. Sternberg, under appointments by the Supreme Court, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, Richard B. Iglehart, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, Ward A. Campbell and Thomas F. Gede, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

LUCAS, C. J.—This is an automatic appeal from a judgment and sentence of death following defendant's conviction of first degree murder committed during a robbery or attempted robbery. (Pen. Code, §§ 187, 190.2, subd. (a)(17)(i); all statutory references are to this code unless otherwise indicated.) Finding no reversible error in the guilt or penalty phases of defendant's trial, we affirm the judgment in its entirety.

## STATEMENT OF FACTS AND PROCEEDINGS BELOW

On August 6, 1984, Linda Pasnick drove her car into the drive-through entrance of a Der Wienerschnitzel fast-food restaurant in Fresno, placed an order at the speaker box, and moved to the service window to await her order. Defendant approached her and thrust his head in the open, driver's side window. When Pasnick looked toward the service window, defendant followed her glance and was seen by the restaurant's assistant manager, who recognized him as a customer. After defendant walked away from Pasnick, the assistant manager asked her whether she knew defendant. Visibly shaken, Pasnick replied she did not and that defendant had attempted to obtain money from her. Pasnick had $4 in her hand; her purse was lying next to her on the car seat.

As the assistant manager rang up Pasnick's sale, Pasnick pointed next door and said, "Look, he's bothering that lady now." The assistant manager observed defendant talking to a woman in front of a nearby 7-Eleven store; she yelled through the window for defendant to leave and threatened to call the police.

Defendant got into his car and drove to the 7-Eleven parking lot, parking his car behind those of two 7-Eleven customers. The customers saw defendant reach across the front seat to the passenger side of his car and then get out of the car. Defendant stared at one of the customers for a few seconds and then walked back to Der Wienerschnitzel, fumbling with the waist of his shirt, which hung loosely outside his pants.

As Pasnick pulled away from the service window, defendant walked up from behind her vehicle, drew a gun from his waist, leaned inside the open driver's side window of her car, and fired at her three times. She fell over to her right side, but managed to pull out onto the street where she headed in the wrong direction and collided with a parked van. A driver passing Pasnick's car observed her body slumped over the seat and bloody; still alive, she asked him to get help, whereupon he left his car and ran to Der Wienerschnitzel.

In the meantime, defendant returned to his car, drove it back to Der Wienerschnitzel, parked it and got out. He again approached Pasnick's car from the rear, walking up to the front passenger window with the gun in his hand. Seeing defendant, Pasnick shook her head back and forth as if to say "no." Defendant fired a shot through the window directly at Pasnick. He stepped back, then stepped forward and fired at her again. He left the scene, got into his car, and drove away.

Defendant returned to his cousins' house, where he had previously spent the night. When he arrived, his cousin Sabrina noticed that her sister Arleena, whom defendant had taken to Winchell's Donuts 45 minutes earlier, was not with him. When she asked defendant where Arleena was, he replied he had left her at Winchell's. Defendant pulled the gun from his pants and asked Sabrina to hold it for him. She took the weapon, and put it in her bedroom, under her pillow. Defendant and Sabrina then left in defendant's car to pick up Arleena.

Winchell's was located near Der Wienerschnitzel. On their way to Winchell's, defendant and Sabrina passed the location of the Pasnick shooting. Law enforcement personnel, paramedics, and witnesses were on the scene. As defendant and Sabrina drove by, people yelled at them to stop. An officer noted that defendant and his car matched the descriptions given by witnesses to the shooting. Sabrina turned to defendant and asked, "Ronnie, what'd you do up here?" Defendant told her to be quiet, increased his speed, and attempted to change lanes to avoid capture. He was apprehended by police.

Defendant's gun was retrieved from Sabrina by police officers. It was a .357 magnum six-shot revolver with spent shells in five of its six chambers. The gun had recently been fired. Pasnick died from gunshot wounds to the neck and head. She suffered five bullet wounds, three on her left and two on her right side. Ballistics analysis of bullet fragments from Pasnick's body revealed they had been fired from defendant's gun. Defendant's fingerprints were found on the murder weapon and on a beer can in his car.

When defendant was booked, he had in his possession a windowed envelope containing $208.23 in cash. Pasnick's sister and husband testified that Pasnick, who was a compulsive spender and was pursuing a career as a model, had adopted the self-disciplinary practice of budgeting for clothing and other special items by placing specific amounts of cash in envelopes that she would take with her on shopping trips. A shopping bag with three shoe boxes containing shoes with attached price tags was found in Pasnick's car.

Defendant testified on his own behalf, denying any involvement in the murder of Linda Pasnick and maintaining he had never been to Der Wienerschnitzel. Defendant admitted he had $208 in cash on him at the time of his arrest, but contended the cash was not in an envelope and that it represented the proceeds of an unemployment check he had received a week earlier. When confronted with his fingerprint on the murder weapon, defendant hypothesized that someone had transferred the print from the beer can in his car or from his police fingerprint roll to the gun.

The defense presented testimony that defendant appeared nervous and fidgety to his aunt and had drunk alcohol and smoked marijuana the day

before he killed Pasnick. Postarrest toxicological testing revealed no drugs or alcohol in defendant's blood.

The jury convicted defendant of first degree murder and robbery with a special circumstance of murder in the commission of a robbery or attempted robbery. Allegations of firearm use and infliction of great bodily injury were also found true.

At the penalty phase, the prosecution presented evidence of three other crimes committed by defendant within approximately four years of the Pasnick murder. On one occasion, defendant started a fight with another man over the man's alleged failure to return jumper cables defendant had purportedly loaned to him. When the fight ended, defendant removed a gun from a trunk of his car and began shooting at the man and his brother as they departed in their car. On a second occasion, defendant, while involved in a fistfight, pulled a gun and shot his cocombatant once, then chased him, firing another shot. The cocombatant died; defendant was convicted of involuntary manslaughter as a result of the incident. On a third occasion, defendant physically assaulted a man and threatened the man's wife after rear-ending his motorcycle.

In his defense, defendant presented a different version of the third incident, maintaining that the man he hit had used a racial epithet and had assaulted him first. Defendant's relatives portrayed him as a "nice person" who had experienced learning disabilities and premature hair loss as a child. One defense psychiatrist diagnosed defendant as schizophrenic and offered an opinion that he had been so for at least a year prior to the Pasnick murder. Another defense psychiatrist, however, believed that defendant was psychotic rather than schizophrenic and hypothesized that his psychosis was drug-induced.

The prosecution disputed defendant's penalty phase evidence. A prosecution expert testified that defendant was neither schizophrenic, nor psychotic, nor under the influence of drugs when he killed Pasnick. With testimony from defendant's landlord and aunt, both of whom reported no evidence of drug use, the prosecution challenged the drug-induced-psychosis defense. Finally, one of defendant's jailers testified defendant had threatened to act crazy at his preliminary hearing if he did not receive his lunch, which he had already been given.

At the close of the penalty phase, the jury fixed the penalty for defendant's crimes at death. Defendant's motion for new trial and the automatic motion for modification of sentence pursuant to section 190.4 were denied and

defendant was sentenced to death. His appeal to this court is automatic. (§ 1239.)

PRETRIAL AND GUILT PHASE CONTENTIONS

## I. *The Competency Determination*

In March 1985, defendant's counsel expressed doubt that defendant was competent to stand trial. The trial court suspended criminal proceedings in accordance with section 1368 and appointed Dr. Charles Davis and, at defendant's request, Dr. Paul Levy to examine defendant. Dr. Levy concluded defendant was incompetent and unable to cooperate in preparing a defense; Dr. Davis observed defendant was hostile and uncooperative and expressed the view he was either feigning mental illness or suffering from a psychosis of undetermined etiology. A third expert, Dr. Hedburg, was then appointed to examine defendant; he found defendant competent to stand trial "at a borderline level." The trial court denied the prosecutor's request for a jury trial on the issue of competence, but the Court of Appeal issued a writ of mandate determining the People had a statutory right to jury trial. (*People v. Superior Court* (*McPeters*) (1985) 169 Cal.App.3d 796 [215 Cal.Rptr. 482].)

In October 1985, Dr. Levy again examined defendant and, based on his four examinations of defendant in 1984 and 1985, issued a new report finding him "in a state of excellent and complete remission from any overtly psychotic symptoms" and "mentally competent to stand trial." He found no evidence of thought disorder, psychotic process, delusions or hallucinations, organic brain syndrome, or psychological depression or anxiety. After receiving Dr. Levy's report, the trial court, at the prosecutor's request, appointed Dr. Davis to reexamine defendant. Dr. Davis issued a two-part report, the first part concerning defendant's mental state at the time of the crime and the second concluding defendant was presently competent to stand trial.

At the time appointed for the hearing on the issue of competence, the prosecutor and defense counsel stipulated the matter would be presented to the court for determination based on the most recent reports of Drs. Levy and Davis. Based on those reports, the court found defendant competent to stand trial and reinstated the criminal proceedings against him.

■ Defendant maintains the above procedure violated his statutory and state and federal constitutional due process rights by depriving him of a full, trial-type, adversary hearing on the issue of his competence to stand trial. To

the contrary, the procedure adopted by counsel and the court did not deprive defendant of any of his rights. Section 1368 entitles defendant to a "hearing" on the issue of competence and he received one. Although defendant's counsel, for understandable reasons, elected to waive certain available incidents of the hearing procedure, i.e., the right to jury trial and the rights to present oral testimony and to confront and cross-examine witnesses, defendant presented evidence and received an independent judicial determination of his competence to stand trial based on the stipulated record. (*People* v. *Cisneros* (1973) 34 Cal.App.3d 399, 406-407 [110 Cal.Rptr. 269].)

Defendant cites no authority holding that submission to the court of the issue of competence to stand trial based on psychiatric reports is per se unconstitutional or a violation of statute. Because defendant had a hearing and does not show it was in any significant way incomplete or unfair, we reject his contention.[1]

II. *The Presumption of Competence Under Section 1369*

Defendant contends the presumption of competence and allocation of the burden of proof under section 1369 violates his due process rights under the state and federal Constitutions. There is no merit in defendant's contention; we have squarely rejected it. (*People* v. *Medina* (1990) 51 Cal.3d 870, 881-886 [274 Cal.Rptr. 849, 799 P.2d 1282], affd. *sub nom. Medina* v. *California* (1992) __ U.S. __ [120 L.Ed.2d 353, 112 S.Ct. 2572].)

III. *Discovery of Prosecution Records*

 Defendant filed a motion for discovery of numerous documents alleged to be in the possession of the Fresno County District Attorney's office, including writings showing the district attorney's capital charging policies, practices, and decisions. The motion also required the accumulation

---

[1]Defendant does point to certain information about his mental state that was not included in the last reports of Drs. Levy and Davis, including earlier psychiatric reports, reports of medication administered while defendant was in the hospital, and other matters. The opinions and events relied on by defendant were four to six months old; some were incorporated in the reports presented to the trial court, which necessarily superseded the prior reports of the same experts. In view of the stale character of the information, defendant fails to show its pertinence to the question of defendant's competence at the time of the hearing. Moreover, defendant fails to point to any evidence that he was in fact incompetent at the time of trial or that his counsel, the trial court, or anyone else entertained any doubts about his competence at that time. Under these circumstances, neither error nor prejudice is present. Nor is there any basis for a claim that defense counsel was ineffective. (§ 1367 ["A person cannot be *tried or adjudged to punishment* while such person is mentally incompetent." Italics added.]; see *People* v. *Aparicio* (1952) 38 Cal.2d 565, 568 [241 P.2d 221]; 5 Witkin & Epstein, Cal. Criminal Law (2d ed. 1989) §§ 2987-2988, pp. 3666-3667 [focus is on defendant's mental competence at time of trial, conviction, and punishment].)

and presentation of a vast amount of statistical data on cases filed and charging decisions made by the district attorney over a seven-year period, including not only complaints and informations filed and case numbers of "special circumstances eligible" cases but "a brief summary of the facts, and race, sex and age data for each defendant and wilful homicide victim." The stated object of the motion was to obtain evidence to support a defense contention that the prosecution had in wilful homicide cases "followed an enforcement policy deliberately based upon an unjustifiable standard," i.e., the race of the victim. (See *Murgia* v. *Municipal Court* (1975) 15 Cal.3d 286, 293-294 [124 Cal.Rptr. 204, 540 P.2d 44].)

In support of his motion, defendant submitted a study conducted by the Fresno County Public Defender's office. The study purported to compare, by race of victim, those Fresno County cases in which defendants were sentenced to death or life in prison without possibility of parole with other Fresno County cases of wilful homicide. The study did not describe or analyze the facts or circumstances of any case, other than the sentence and the race of victim. For example, it did not attempt to distinguish between single and multiple homicide cases, nor did it attempt to account for nonracial factors that could have explained differences in charging and sentencing. The study purported to show that while only one-third of all wilful homicide victims in the county were White, all death or life-without-parole sentences were meted out in cases involving White victims.

In a memorandum decision analyzing the evidence presented in support of the motion, the trial court ruled defendant had failed to make out a prima facie case sufficient to support the discovery sought. Its decision emphasized the absence of any factual comparison among the homicide cases presented by defendant, despite the availability of information in the public record that could have been used to make such a comparison.

█ "Apparent disparities in sentencing are an inevitable part of our criminal justice system." (*McCleskey* v. *Kemp* (1987) 481 U.S. 279, 312 [95 L.Ed.2d 262, 291, 107 S.Ct. 1756], fn. omitted.) "[C]onstitutional guarantees are met when 'the mode [for determining guilt or punishment] itself has been surrounded with safeguards to make it as fair as possible.' [Citation.] Where the discretion that is fundamental to our criminal process is involved, we decline to assume that what is unexplained is invidious." (*Id.* at p. 313 [95 L.Ed.2d at p. 292].) In *McCleskey*, the Supreme Court held that an extensive study of 2,000 Georgia murder cases showing an apparent discrepancy in capital sentencing based on race of victim did not demonstrate a "constitutionally significant risk of racial bias affecting the Georgia capital sentencing process." (*Ibid.*)

"Many circumstances may affect the litigation of a case chargeable under the death penalty law. These include factual nuances, strength of evidence, and, in particular, the broad discretion to show leniency. Hence, one sentenced to death under a properly channeled death penalty scheme cannot prove a constitutional violation by showing that other persons whose crimes were superficially similar did not receive the death penalty." (*People* v. *Keenan* (1988) 46 Cal.3d 478, 506 [758 P.2d 1081].)

■ Although a defendant seeking discovery is "not required to meet the standard of proof requisite to the dismissal of a discriminatory prosecution" (*People* v. *Municipal Court (Street)* (1979) 89 Cal.App.3d 739, 748 [153 Cal.Rptr. 69]), discovery is not a fishing expedition. A motion for discovery must " 'describe the requested information with at least some degree of specificity and . . . be sustained by plausible justification.' " (*Griffin* v. *Municipal Court* (1977) 20 Cal.3d 300, 306 [142 Cal.Rptr. 286, 571 P.2d 997].) No "plausible justification" was offered by the defense in this case. Defendant showed no more than the barest form of "apparent disparity." His presentation ignored readily available, case-specific data that could, if favorable, have supplied a plausible justification for further inquiry. We are directed to no authority that requires the kind of wide-ranging foray sought by defendant based on such a meager showing. No right of defendant, constitutional or otherwise, was infringed by the denial of his discovery motion.

IV. *Seizure of the Murder Weapon*

■ In a pretrial motion under section 1538.5, defendant contended that his constitutional rights were violated by the unlawful seizure of his gun. Police obtained the gun from defendant's cousin, Sabrina Epperson, with whom he had left it. The trial court denied the motion, ruling defendant had no standing to challenge the admissibility of the gun. Defendant contends the trial court erred in failing to suppress the gun.

In this post-Proposition 8 case, the issue is whether the seizure of defendant's gun from his cousin violated defendant's rights under the Fourth Amendment to the United States Constitution. (*In re Lance W.* (1985) 37 Cal.3d 873, 879 [210 Cal.Rptr. 631, 694 P.2d 744].) ■ "An illegal search or seizure violates the federal constitutional rights only of those who have a legitimate expectation of privacy in the invaded place or seized thing. (*United States* v. *Salvucci* (1980) 448 U.S. 83, 91-92 [65 L.Ed.2d 619, 628, 100 S.Ct. 2547].) The legitimate expectation of privacy must exist in the *particular area searched or thing seized* in order to bring a Fourth Amendment challenge." (*People* v. *Hernandez* (1988) 199 Cal.App.3d 1182, 1189 [245 Cal.Rptr. 513], italics in original.)

Because the historical facts concerning standing are established by uncontradicted evidence, we review independently the trial court's ruling that defendant lacked standing to challenge seizure of the gun. (*People v. Williams* (1988) 45 Cal.3d 1268, 1301 [248 Cal.Rptr. 834, 756 P.2d 221].) Defendant bears the burden of showing a legitimate expectation of privacy. (*Rawlings v. Kentucky* (1980) 448 U.S. 98, 104 [65 L.Ed.2d 633, 641, 100 S.Ct. 2556].) A claim of ownership in property seized does not necessarily signify a legitimate expectation of privacy, although it is one factor to be considered in the analysis. (*Id.* at p. 105 [65 L.Ed.2d at pp. 641-642].) Among the factors to be considered are: " ' "whether the defendant has a [property or] possessory interest in the thing seized or the place searched; whether he has the right to exclude others from that place; whether he has exhibited a subjective expectation that it would remain free from governmental invasion, whether he took normal precautions to maintain his privacy and whether he was legitimately on the premises." ' [Citations omitted.]" (*People v. Hernandez, supra,* 199 Cal.App.3d at p. 1189.)

■ Applying these factors to the evidence before the trial court, we conclude defendant had no reasonable expectation of privacy as to the gun. While an overnight guest in his relatives' home, he gave the gun to his cousin Sabrina, asking her to hold it for him. She put the weapon in her own bedroom under her pillow. Although defendant owned the gun and was in the house by permission, he exhibited no concern whatever in knowing the specific place where it was to be kept; moreover, he failed to show he had any legitimate access to that place. He had no right to exclude others from his cousin's bedroom. Moreover, defendant took no precautions to maintain any privacy with respect to his gun—he parted with it voluntarily, knowing it would be kept by another person in a place both unknown to him and over which he had no control. Defendant's behavior was consistent with a desire to rid himself of the gun that had obviously become a "hot" item; whether he intended to do so temporarily or permanently, he clearly asserted no continuing *private* interest in it.

Having voluntarily surrendered his gun to his cousin with no attempt to control or safeguard its location, defendant had no standing to complain when police obtained it from her. (See, e.g., *People v. Martins* (1991) 228 Cal.App.3d 1632, 1637 [279 Cal.Rptr. 687] [no standing to challenge search of locked suitcase shipped across country in name of another person where both shipping airline and party to whom suitcase was addressed consented to search]; *People v. Root* (1985) 172 Cal.App.3d 774, 776-779 [218 Cal.Rptr. 182] [no standing to challenge seizure of unsealed bag placed in automobile of another].)

Our rejection of defendant's claim of standing also disposes of his related arguments. Defendant's assertion that his cousin was illegally arrested and

coerced into surrendering the weapon is an attempt to invoke *her* constitutional rights; defendant lacks standing to do so. Defendant's further assertion that his trial counsel failed to develop an adequate record at the suppression hearing likewise lacks merit. ■ Defense counsel is not required to advance unmeritorious arguments on the defendant's behalf. (*People* v. *Ledesma* (1987) 43 Cal.3d 171 [233 Cal.Rptr. 404, 729 P.2d 839]; *People* v. *Taylor* (1984) 162 Cal.App.3d 720, 726 [208 Cal.Rptr. 708]; *People* v. *Eckstrom* (1974) 43 Cal.App.3d 996, 1001-1003 [118 Cal.Rptr. 391].)

## V. *The Wheeler Challenges*

■ Two Black men, Carlos Brewer and Henry Freeman, were peremptorily challenged by the prosecutor. Defendant objected to the challenges based on the rule of *People* v. *Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748], and *Batson* v. *Kentucky* (1986) 476 U.S. 79 [90 L.Ed.2d, 106 S.Ct. 1712]. In each case, after the objection was interposed, the trial court asked the prosecutor to place on the record his reasons for the challenges. On consideration of the reasons, the court overruled the objections, finding no prima facie case of racial discrimination had been made out.

■ Under the procedure we adopted in *Wheeler*, the burden of showing a peremptory challenge is not based on group bias does not shift to the prosecutor until a prima facie case of such bias has been made. (*Wheeler, supra,* 22 Cal.3d at pp. 281-283.) ■ Although the trial court here inquired into the prosecutor's reasons for the two challenges *before* determining whether a prima facie case had been made, its failure to follow the prescribed procedure did not constitute error.

Assuming, arguendo, a prima facie case of *Wheeler* discrimination was made out, the prosecutor articulated a race-neutral explanation related to the case, i.e., a "specific bias" as opposed to "group bias" for each of the challenged jurors. (*People* v. *Johnson* (1989) 47 Cal.3d 1194, 1216 [255 Cal.Rptr. 569, 767 P.2d 1047].) As to Brewer, the prosecutor pointed to his statement on voir dire examination that a "nickel and dime" impromptu robbery might not merit the death penalty. Although Brewer later attempted to shift the emphasis from the amount involved in the robbery to the "humanity" of the crime, his statement afforded a basis for peremptory challenge grounded in the specific facts of this case. This case could well have been characterized as a "nickel and dime" impromptu robbery in the prospective juror's mind, evincing a possible bias against the death penalty.

As to Freeman, the prosecutor pointed to voir dire statements that Freeman did not believe in the death penalty and would change the law to

eliminate it and did not like to sit in judgment of others. Again, in a death penalty prosecution including a robbery special circumstance, the record supports the existence of a "specific bias" supporting the peremptory challenge.

On appeal, defendant seeks to place his objection to the peremptory challenges on federal Constitution, Sixth Amendment as well as *Wheeler* (*supra*, 22 Cal.3d 258) grounds. Having failed to raise a Sixth Amendment argument below, defendant has waived it. On the merits, he offers nothing to show a Sixth Amendment ground would justify a different result with respect to the peremptory challenges. Regardless of the legal ground asserted, the prosecutor's challenges were specifically grounded in particular facts; they evinced no group bias so as to deprive defendant of any of his rights.

## VI. *Failure to Remove Juror House*

When the name of Victor Pasnick, the victim's husband, was read to the jury along with other possible trial witnesses, Juror House did not admit to knowing Pasnick. After the jury was sworn but before opening statements were delivered, the trial court reported receiving a phone call from House, who indicated he had acquired some information about the case he wished to discuss. House was summoned into court and, with counsel present, stated he had learned he might be acquainted with Victor Pasnick. He revealed that he was in the process of buying a house, that Pasnick might be the seller's real estate agent, and that he had met and spoken with the agent on at least three occasions at the agent's office. The prosecutor confirmed that Pasnick was in the real estate business and there appears to be no dispute that he was the agent representing the seller in the residential purchase transaction to which House was a party. House had completed the documents necessary to close the escrow and complete the sale, had last met with the agent five weeks earlier, and there was no indication that the two would have any further dealings.

In response to questioning from the court and counsel, House stated that he had not discussed the case with Pasnick, and, although he thought highly of Pasnick and initially felt this might affect his judgment, he affirmed his ability to be objective and stated he would assume Pasnick's credibility was equal to that of any other witness.

Defense counsel objected to House's continued service as a juror and requested his removal and replacement with one of the four alternate jurors. Counsel was unable to articulate a specific legal basis for the objection and conceded in response to further questioning by the court that Pasnick's testimony would not be the subject of serious controversy in the case. Based

on House's responses and the evidence and argument in the record, the trial court found that House had no bias, express or implied, and would be a fair and impartial juror. Defendant's motion to remove him was denied.

Federal defendant contends the court's ruling violated both section 1089 and his Sixth Amendment right to an impartial jury. We disagree. Implicit in the court's finding and remarks was a determination that House's initial failure to disclose his relationship with Pasnick was inadvertent and unintentional. Defendant does not challenge this determination and, indeed, argues that the trial court was required to remove House from the jury even if his failure to disclose his business transaction with Pasnick was unintentional. Defendant is incorrect. Although intentional concealment of material information by a potential juror may constitute implied bias justifying his or her disqualification or removal (*People* v. *Morris* (1991) 53 Cal.3d 152, 183-184 [279 Cal.Rptr. 720, 807 P.2d 949]; *People* v. *Blackwell* (1987) 191 Cal.App.3d 925, 929-931 [236 Cal.Rptr. 803]), mere inadvertent or unintentional failures to disclose are not accorded the same effect. "[T]he proper test to be applied to unintentional 'concealment' is whether the juror is sufficiently biased to constitute good cause for the court to find under Penal Code sections 1089 and [former] 1123 that he is unable to perform his duty." (*People* v. *Jackson* (1985) 168 Cal.App.3d 700, 706 [214 Cal.Rptr. 346].)

Whether a failure to disclose is intentional or unintentional and whether a juror is biased in this regard are matters within the discretion of the trial court. Except where bias is clearly apparent from the record, the trial judge is in the best position to assess the state of mind of a juror or potential juror on voir dire examination. (*People* v. *Morris, supra,* 53 Cal.3d at p. 186, fn. 4; *People* v. *Johnson, supra,* 47 Cal.3d at p. 1224.)

Applying these rules, we hold the trial court did not abuse its discretion in finding House's nondisclosure to be inadvertent and, further, in finding no express or implied bias on his part. In the context of voir dire examination, it is conceivable a juror might not immediately remember the name of a real estate agent with whom he had recently dealt or recognize the agent's name on a long list of witnesses. Notwithstanding his contact with Pasnick, which in any event was brief and not naturally or inevitably productive of bias, House affirmed his belief he could be fair and impartial. His candid disclosure of the contact even before the trial began further supports his determination to be a fair and impartial juror. Under these circumstances, neither defendant's Sixth Amendment rights nor his rights under section 1089 were infringed.

*People* v. *Diaz* (1984) 152 Cal.App.3d 926 [200 Cal.Rptr. 77], cited by defendant, is distinguishable. In *Diaz,* the jury foreperson failed to disclose

she was assaulted with a knife during an attempted rape and had pursued and stabbed her assailant, despite specific voir dire questions whether she had been a victim of a crime or involved in a knife fight. In view of the traumatic nature of the event and the specificity of the questions, it is highly unlikely the foreperson's nondisclosure was inadvertent.

## VII. *Defendant's Challenge for Cause of Prospective Juror Lorenz*

After the trial court rejected a defense challenge for cause to prospective juror Lorenz, he was seated as an alternate. Lorenz did not participate in guilt phase deliberations, but was called on to serve at the penalty phase when a regular juror was excused. ▉▉▉ Defendant argues he was prejudiced by the trial court's refusal to sustain the challenge and excuse Juror Lorenz; he also maintains he was denied the effective assistance of counsel when his trial attorney apparently lost track of the number of peremptory challenges he had used. Neither contention has merit.

As defendant observes, there was some inconsistency in Lorenz's responses to voir dire questions by the court and counsel. Lorenz recalled hearing or reading about the case. Based on what he heard or read, he stated his belief the accused was more likely to be guilty than innocent. He also stated his belief that a person was more apt to be guilty because he had been arrested and charged. On further examination, however, Lorenz affirmed several times his ability to make a decision based on the evidence and not on what he heard or read before trial. After observing Lorenz's responses to counsel's questions and asking several of his own, the trial court scrutinized the inconsistency in Lorenz's answers and expressly found him to be impartial.

▉▉▉ The qualifications of jurors challenged for cause are a matter within the broad discretion of the trial court, seldom disturbed on appeal. (*Odle* v. *Superior Court* (1982) 32 Cal.3d 932, 944 [187 Cal.Rptr. 455, 654 P.2d 225].) " 'Where a prospective juror gives conflicting answers to questions relevant to his impartiality, the trial court's determination as to his state of mind is binding upon an appellate court . . . .' " (*People* v. *Bittaker* (1989) 48 Cal.3d 1046, 1089 [259 Cal.Rptr. 630, 774 P.2d 659].) ▉▉▉ Although the trial court could have excused Juror Lorenz based on his answers, it was not compelled to do so. From the record, we cannot say that Lorenz's candor in admitting his reactions to pretrial information necessarily evinces bias when considered along with his assurances that he could set aside what he had read or heard and could decide the case based on the law and the evidence presented to him. There was no abuse of discretion in denying the challenge for cause.

■ Defendant also argues his trial counsel was ineffective because he twice lost count of the number of defense peremptory challenges during the selection of alternate jurors. The record does show inquiries by counsel about the number of challenges left, including one after they were exhausted.

■ "[T]o be entitled to reversal of a judgment on grounds that counsel did not provide constitutionally adequate assistance, the petitioner must carry his burden of proving prejudice as a 'demonstrable reality,' not simply speculation as to the effect of the errors or omissions of counsel." (*People* v. *Williams* (1988) 44 Cal.3d 883, 937 [245 Cal.Rptr. 336, 751 P.2d 395].)
■ Assuming counsel's performance was deficient for losing track of the peremptory challenge count, defendant cannot demonstrate prejudice. Each of the four prospective alternate jurors challenged peremptorily by defendant expressed some strong pro-death-penalty or pro-guilt views or had direct personal or family connections with law enforcement. Defendant's suggestion that effective defense counsel aware of the count would have saved his final challenge for Juror Lorenz is pure speculation.

Defendant was not prejudiced for another, independent reason. Juror Lorenz began the trial as an alternate juror; he did not participate in deliberations or the rendition of a verdict in the guilt phase. He joined the jury only in the penalty phase after another juror was excused. Lorenz's voir dire responses with respect to the death penalty were unequivocal and consistent with his obligations as a juror in a capital case. Although he professed to be in favor of the death penalty, he also believed the death penalty should not be imposed for all murders and acknowledged both the seriousness of a decision to impose the death penalty and a willingness to accept personal responsibility for that decision. Defendant has failed to demonstrate that any of Lorenz's statements regarding his beliefs as to guilt or innocence had any necessary impact on his penalty decision or the penalty verdict; thus, defendant has failed to show prejudice.

VIII. *Challenge for Cause of Prospective Juror Fries*

■ Contrary to defendant's argument, the trial court properly sustained a prosecution challenge for cause to prospective juror Fries. A juror is not qualified to serve in a capital case if his or her views about the death penalty would " 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " (*Wainwright* v. *Witt* (1985) 469 U.S. 412, 424 [83 L.Ed.2d 841, 105 S.Ct. 844].) At the outset, Fries announced that his aversion to the death penalty was so strong he could never vote for it. On further questioning, he acknowledged the prospect he might vote for death if the crime were "really horrid" such as the murder of

many children, but steadfastly maintained that, regardless of the facts, he could not vote for death in a case of robbery and first degree murder.

The trial judge was in the best position to assess the depth and sincerity of Fries's expressed convictions and their likely impact on him as a decision maker. (*People* v. *Ghent* (1987) 43 Cal.3d 739, 767 [239 Cal.Rptr. 82, 739 P.2d 1250].) The record more than amply supports the court's conclusion that Fries's personal beliefs would either prevent or substantially impair his ability to follow the law in arriving at a verdict in this case.

IX. *The Victim's Habit of Carrying Money in Envelopes*

In an effort to bolster the charge of robbery and the robbery special circumstance, the prosecution was permitted to introduce evidence of Linda Pasnick's habit of placing cash in envelopes as a means of earmarking funds for special purchases. Her husband, Victor Pasnick, testified to this habit, which was developed by the victim as a means of overcoming another apparent habit: compulsive spending.

 There was no abuse of discretion in the court's decision to admit the habit evidence. Evidence Code section 1105 provides that "[a]ny otherwise admissible evidence of habit or custom is admissible to prove conduct on a specified occasion in conformity with the habit or custom." At the foundational hearing, Victor Pasnick testified as to the victim's regular conduct under certain specified conditions, i.e., "when she was paying bills of amounts owed to someone for a particular thing." According to his testimony, these conditions did not include all purchases, but did include special purchases for personal items such as clothing.

 The question whether habit evidence is admissible is essentially one of threshold relevancy (*People* v. *Wein* (1977) 69 Cal.App.3d 79, 91 [137 Cal.Rptr. 814]); it is addressed to the sound discretion of the trial court. (*People* v. *Green* (1980) 27 Cal.3d 1, 19 [164 Cal.Rptr. 1, 609 P.2d 468].) Here, there was "evidence of repeated instances of similar conduct" sufficient for the trial court to conclude a habit was present. (*People* v. *Memro* (1985) 38 Cal.3d 658, 681 [214 Cal.Rptr. 832, 700 P.2d 446].)

In addition to asserting error in the admission of the habit evidence, defendant also maintains the trial court prevented him from effectively cross-examining the victim's husband on the issue of habit at the foundational hearing. Defendant cites a colloquy between the court and defense counsel wherein the court questioned the relevancy of counsel's question whether the victim had spent some of the $2,000 to $3,000 she had planned to spend on a modeling competition before the date of her murder.

Initially, the court did not sustain any objection or specifically preclude any line of inquiry. Its mere inquiry was not a definite ruling against defendant's proposed examination; the absence of an adverse ruling precludes any appellate challenge. (*Haskell* v. *Carli* (1987) 195 Cal.App.3d 124, 120 [240 Cal.Rptr. 439] [failure to secure ruling waives issue on appeal].)

Moreover, no abuse of discretion is shown. As the court indicated, the inquiry was of questionable relevance to the issue of the victim's habit of segregating funds in envelopes and making payments from the envelopes. Finally, no prejudice is shown. Even if the victim's husband had admitted that some of the $2,000 to $3,000 had been spent, this would not necessarily have precluded the victim from having a few hundred dollars with her in an envelope on the day of her murder.

## X. *Defense Counsel's Failure to Seek a Remedy for Discarding the Envelope*

 Defendant argues his trial counsel rendered ineffective assistance by failing to seek suppression or another appropriate judicial remedy for the actions of police in discarding the envelope found on defendant's person when he was booked. Although two deputies testified defendant was in possession of an envelope containing $208.23 at the time he was booked, the envelope was apparently discarded by the booking officer pursuant to standard procedures that provided for the retention of the cash, but not its paper container.

 In *People* v. *Douglas* (1990) 50 Cal.3d 468, 512-513 [268 Cal.Rptr. 126, 788 P.2d 640], we held the People's duty to preserve evidence, whether grounded in the state or federal Constitution, was to be assessed following Proposition 8 in accordance with the standard articulated in *California* v. *Trombetta* (1984) 467 U.S. 479, 488-489 [81 L.Ed.2d 413, 421-422, 104 S.Ct. 2528]: " 'Whatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a role in the suspect's defense. *To meet this standard of constitutional materiality [citations], evidence must possess both an exculpatory value that was apparent before the evidence was destroyed,* and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means. . . .' " (*Douglas, supra,* at p. 512, italics added.)

 The lost envelope was of dubious exculpatory value. Although defendant asserts on appeal the production of the envelope might have shown it was not the type of envelope carried by the victim (windowed with

writing on the outside showing the amount of money enclosed), at trial he testified there was no envelope. But assuming the envelope did have some exculpatory value, defendant failed to establish that value was "apparent before the evidence was destroyed." The record reveals without contradiction that the envelope was discarded pursuant to standard police procedure; there is no evidence suggesting officers knew or should have known at the time of its disposal that the manner in which defendant carried money on his person would be in issue or of value to the defense.

## XI. *Admission of Evidence Regarding the Envelope*

 Defendant also challenges the admission of evidence that defendant was in possession of the white envelope containing $208.23 at the time he was booked. Initially, defendant failed to object to admission of this evidence in the trial court and has therefore waived the issue on appeal. (Evid. Code, § 353; *People* v. *Harris* (1981) 28 Cal.3d 935, 962 [171 Cal.Rptr. 679, 623 P.2d 240].) Moreover, the evidence was properly admitted; therefore, defense counsel was not ineffective in failing to object. One officer testified that he was fairly positive the money was in an envelope and that standard booking practice was to discard such an envelope and use a jail envelope to keep any cash found on a prisoner's person. Another officer testified defendant had a regular, white letter-sized envelope in his right hand when he entered into the booking area and was clutching it, claiming it was his money.

Defendant's various arguments about this testimony, e.g., that it was not sufficiently certain and did not include evidence that the envelope was marked with an amount and a type of purchase, went to its weight rather than its admissibility. They were properly addressed to the jury. None of defendant's arguments establishes any statutory or constitutional infirmity in the admission of such relevant circumstantial evidence.

 Defendant's argument that the testimony violated the best evidence rule also fails. That rule applies only when the "contents" of a "writing" are at issue, not merely the existence of a physical object. (Evid. Code, § 1505; see *People* v. *Whittaker* (1974) 41 Cal.App.3d 303, 309 [115 Cal.Rptr. 845]; *People* v. *Daniels* (1971) 16 Cal.App.3d 36, 46 [93 Cal.Rptr. 628].) Moreover, even assuming content was at issue, the envelope was not in existence at the time of trial. Neither the police nor the prosecution destroyed it with fraudulent intent. Testimony may be adduced to prove the content of a lost writing. (Evid. Code, §§ 1501, 1505.)

## XII. *Alleged Prosecutorial Misconduct at the Guilt Phase*

 Defendant charges the prosecutor with various acts of misconduct during the guilt phase. At the outset, we observe that defendant failed to

object to any of the asserted acts of misconduct at trial or to make any motions to strike, for mistrial, or for other appropriate relief in response to the prosecutor's acts. Because no incident cited by defendant was impervious to correction by a timely admonition, defendant has waived his right to challenge the alleged misconduct on appeal. (*People* v. *Green, supra*, 27 Cal.3d at p. 27.)

Moreover, each of defendant's charges of misconduct is either without merit, nonprejudicial, or both. ▮▮▮ First, defendant contends that the district attorney recalled the booking officer as a witness for the sole purpose of drawing a defense objection and creating the appearance that defense counsel was preventing the jury from hearing evidence harmful to defendant, i.e., that an envelope had been listed under "miscellaneous property" on the booking inventory list. There were other, equally plausible reasons for recalling the officer, including some vagueness in the officer's prior testimony as to his recollection of the contents of the inventory. Significantly, neither defense counsel nor the court drew the inference now suggested by defendant on appeal. The record does not reflect any suspicion of misconduct on their part. Moreover, as a result of the recall of the officer, defendant was able to emphasize a fact beneficial to his case—that there was no notation on the inventory list referring to a white envelope. There is no basis for defendant's assertion that he was prejudiced by the recall of the officer.

▮▮▮ Second, the prosecutor cross-examined defendant about his financial situation at the time of the murder. In response to one of the prosecutor's questions, defendant denied that he had ever borrowed money from his cousin Robert. The prosecutor presented defendant with a statement, purportedly given by Robert to a prosecution investigator, in which Robert stated defendant had borrowed money from him; the prosecutor then asked whether the statement refreshed his recollection. There is no indication of any bad faith on the prosecutor's part; indeed, the existence of the investigator's statement suggests the prosecutor had a good faith basis to question defendant's denial of ever obtaining loans from Robert. Assuming the prosecutor's tactic to be an attempt to introduce inadmissible hearsay, any error could have been cured by a timely defense objection and admonition; because no such objection was made, any alleged misconduct was waived. (*People* v. *Bell* (1989) 49 Cal.3d 502, 531-532 [262 Cal.Rptr. 1, 778 P.2d 129].) Moreover, the challenged cross-examination was brief; defendant points to nothing in the record to show the prosecutor dwelled on the issue either in further examination or in argument. No prejudice appears.

▮▮▮ Third, Lorita Adams, a dressmaker who made clothes for the victim, testified at trial that the victim was scheduled to come in for a fitting

on a Tuesday, the day after her murder. Adams further stated she planned to have garments ready for the victim to purchase at that time. Adams's testimony thus suggested a possible reason for the victim's carrying cash in an envelope on the day of her murder. Defendant points to differences between Adams's trial testimony and her preliminary hearing testimony, in which she stated she would not have had the garments finished by Tuesday, but would have needed until Thursday to complete them; based on the differences, he charges the prosecutor with deliberate presentation of false and misleading testimony.

The differences in Adams's testimony do not suggest prosecutorial misconduct. Initially, the record does not reveal that perjured testimony was knowingly presented by the prosecution. (*People* v. *Gordon* (1973) 10 Cal.3d 460, 473-474 [110 Cal.Rptr. 906, 516 P.2d 298]; *In re Imbler* (1963) 60 Cal.2d 554, 560 [35 Cal.Rptr. 293, 387 P.2d 6].) Moreover, the critical issue was whether the victim, not Adams, anticipated that one or more garments might be finished and was therefore carrying money in an envelope to pay for them. On that issue, there was uncontradicted testimony that the victim was to wear the garments made by Adams in a fashion show the Friday of the week she was killed; that she was scheduled to come in for a fitting of the skirts on Tuesday; and that if she decided to wait while Adams hemmed the skirts, she would have paid for them then and taken them with her. Based on this testimony, the jury could have inferred a belief on the part of the victim that the garments might be finished on Tuesday and ready to pick up at that time. Finally, defense counsel was given ample opportunity to impeach Adams's testimony and to rebut this inference with other evidence. Neither prosecutorial misconduct nor prejudice appears.

For the reasons stated above, none of defendant's rights, including without limitation his rights under the Fifth, Sixth, Eighth, or Fourteenth Amendments, was violated by the conduct of the prosecutor.

XIII. *Sufficiency of Evidence of Robbery and Robbery-murder Special Circumstance*

Defendant maintains the evidence of the crime of robbery and of the robbery-murder special circumstance was insufficient to sustain the jury's findings of guilt. To the contrary, there is substantial evidence sustaining the verdict.

Viewed in a light most favorable to the verdict (*People* v. *Johnson* (1980) 26 Cal.3d 557, 576 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255]), the substantial, credible evidence at trial included the following: While the

victim's car was waiting at a fast-food, take-out stop, defendant approached her. He sought money from her in a manner that induced fear and caused her to tremble. Later, defendant went to his car, removed a gun from the glove compartment, and approached the victim a second time. Defendant leaned his head and shoulders well inside the open driver's side window and remained there for 30 to 45 seconds. He shot the victim three times from the driver's side, then walked away and returned, shooting her twice from the passenger side. At the time of his booking, defendant was in possession of an envelope containing $208.23. The victim's practice was to segregate money in envelopes for special purchases.

Defendant points to various alleged contradictions or inconsistencies in the evidence and urges many of the same inferences he argued to the jury. It was within the province of the jury as the trier of fact to assess the credibility of the witnesses and weigh the available inferences. (*People* v. *Ozene* (1972) 27 Cal.App.3d 905, 910 [104 Cal.Rptr. 170].) Although the evidence of robbery-murder was not conclusive, the jury could infer that defendant had the opportunity to steal (he leaned into the victim's car), did steal (he was found in possession of an envelope with money), and killed his victim to accomplish his crime. Both the actual taking of property and the intent to steal are established by substantial, although not uncontradicted, evidence. This evidence is sufficient to sustain the robbery conviction and the robbery-murder special circumstance. (*People* v. *Johnson, supra,* 26 Cal.3d 557, 575-579.)

Significantly, defendant does not challenge the admission of Pasnick's spontaneous statement that defendant approached her and asked for money in a manner that caused her to fear for her safety. Nor does he raise any issue with respect to the further evidence that Pasnick had cash in her hand when defendant first approached her and failed to obtain her money. Even if defendant took no money from Pasnick, the jury could infer that defendant's decision to get his gun, and his return, armed, to Pasnick's car where he leaned through the driver's window, all constituted an attempt to commit robbery. From this evidence, the jury could reasonably conclude, at a minimum, that Pasnick's murder was carried out in the course of an attempted robbery. (§ 190.2, subd. (a)(17)(i).)

## XIV. *Defendant's Wallet*

Defense counsel introduced defendant's wallet, as it was found by defendant's brother in the glove compartment of defendant's car after his arrest. ■ Defendant argues the admission of the wallet constituted prejudicial error and ineffective assistance of counsel because the wallet contained

business cards of a prison services counselor, a deputy probation officer, a deputy public defender, and two private attorneys. The cards, defendant maintains, caused the jury to link him with the criminal justice system.

Defendant himself was responsible for the admission of his wallet in evidence. Its admission was not inadvertent; the defense obviously wanted the wallet placed before the jury with its contents as they existed at the time of his arrest. Defense counsel, representing to the court that he had intended to do so earlier, moved to have the wallet introduced into evidence after both sides had rested and the jury was deliberating.

Tactical reasons for introduction of the wallet are apparent. For example, the wallet might have served to corroborate defendant's otherwise unsupported testimony as to the wallet's existence and location or as to defendant's practice of carrying cash on his person rather than in the wallet. Under these circumstances, the introduction of the wallet itself was not error. Even if error, it was clearly invited error and did not constitute ineffective assistance of counsel. (*People* v. *Marshall* (1990) 50 Cal.3d 907, 931 [269 Cal.Rptr. 269, 790 P.2d 676]; *People* v. *Wickersham* (1982) 32 Cal.3d 307, 330 [185 Cal.Rptr. 436, 650 P.2d 311].)

As to the business cards in the wallet, assuming defense counsel or the court erred in allowing them to remain where they were, defendant was not prejudiced. The business cards did not demonstrate defendant was a convicted criminal, let alone what offenses he had committed. In a case in which defendant's guilt was established by the testimony of numerous eyewitnesses as well as corroborating physical evidence, and in which defendant's credibility was undermined by his own inherently improbable testimony denying any connection with the murder of Linda Pasnick, there is no reasonable possibility the jury's verdict was based on a few business cards. Because the result would have been no different in the absence of the supposed error, neither counsel's performance nor the court's ruling requires reversal. (*Strickland* v. *Washington* (1984) 466 U.S. 668, 688 [80 L.Ed.2d 674, 693-694, 104 S.Ct. 2052]; *People* v. *Ledesma, supra,* 43 Cal.3d 171, 217.)

XV. *Failure to Give CALJIC No. 17.01*

■ In view of the prosecution's theory that defendant took money from Linda Pasnick that she kept in an envelope or a red wallet (which was not located after her murder), defendant contends the trial court erred in failing to charge the jury sua sponte in the words of CALJIC No. 17.01 that defendant could be found guilty only if the jurors agreed "he committed the same act or acts."

The "act" at issue was the single act of taking money from one victim on one occasion within a matter of at most a few minutes, an act that the jury was instructed was a necessary element of the crime of robbery. It was not necessary for the jury to agree as to whether the money was kept in the purse or in the envelope before it was stolen. Therefore, the instruction was not required. (See *People v. Carrera* (1989) 49 Cal.3d 291, 311 [261 Cal.Rptr. 348, 777 P.2d 121]; *People v. Mitchell* (1986) 188 Cal.App.3d 216, 222 [232 Cal.Rptr. 438]; *People v. Kent* (1981) 125 Cal.App.3d 207, 212 [178 Cal.Rptr. 28].)

## XVI. *Unanimity Instruction as to Theory of First Degree Murder*

At the request of the prosecutor, the trial court instructed the jury that it need not agree on the theory on which it found defendant guilty of first degree murder (i.e., premeditated murder or felony murder while defendant was engaged in the commission of a robbery or attempted robbery). Defendant's contention that this instruction deprived him of due process and his right to jury trial by allowing a less-than-unanimous verdict is contrary to established law and is rejected on that basis. (*People v. Milan* (1973) 9 Cal.3d 185, 194-195 [107 Cal.Rptr. 68, 507 P.2d 956]; see also *Schad* v. *Arizona* (1991) 500 U.S. __ [115 L.Ed.2d 555, 111 S.Ct. 2491].)

In any event, any alleged error is harmless. The jury's findings of robbery and the robbery-murder special circumstance signify unanimous agreement with a first degree felony-murder theory. (*People v. Lee* (1987) 43 Cal.3d 666, 669 [238 Cal.Rptr. 406, 738 P.2d 752]; *People v. Stowe* (1987) 188 Cal.App.3d 1605, 1620 [234 Cal.Rptr. 184].)

## XVII. *The In Camera Hearing on Defendant's Testimony*

After both sides rested in the guilt phase but before final arguments, the trial court directed defendant and defense counsel to go before another judge of the superior court to permit a sealed statement to be made for the record regarding defendant's decision to testify on his own behalf. The ostensible purpose of this procedure was to preserve for appeal the contemporaneous views of defendant and trial counsel with respect to defendant's testimony at the guilt phase. In the course of a colloquy about the procedure, the trial court expressed concern about defendant's testimony in light of evidence of his drug and alcohol use.

Although the procedure adopted by the trial court was somewhat unorthodox, defendant has demonstrated neither error nor prejudice under the circumstances of this case. Neither the trial judge nor the jury heard any

aspect of the in camera proceeding before the other judge. Contrary to defendant's argument, the trial judge's desire to preserve the record without becoming enmeshed in the attorney-client relationship between defendant and his counsel did not give rise to a sua sponte judicial duty to hold a hearing on the effectiveness of counsel or the mental state of defendant. There is no evidence defendant was acting irrationally. (See, in contrast, *Drope* v. *Missouri* (1975) 420 U.S. 162, 180 [43 L.Ed.2d 103, 118, 95 S.Ct. 896].)

Finally, defense counsel's decision to put his client on the stand at the guilt phase was not so clearly improvident as to give rise to an inference that counsel was not acting "in a manner to be expected of reasonably competent attorneys acting as diligent advocates." (*People* v. *Pope* (1979) 23 Cal.3d 412, 425 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1].) There is no showing defense counsel either failed to advance an available defense, advised his client to give false testimony, or otherwise acted or failed to act in a manner that adversely affected the defense.

XVIII. *Defense Counsel's Closing Argument in the Guilt Phase*

 Defendant contends his trial counsel was ineffective in closing argument because counsel conceded defendant's presence at the scene of the crime (thereby repudiating defendant's alibi testimony) and proferred a statutorily abolished defense of diminished capacity. We disagree with defendant's assessment of counsel's performance.

Going into final argument, the prosecution had presented an extremely strong case against defendant. Five eyewitnesses identified him as the murderer or placed him at the scene of the crime. One of those witnesses, a Der Wienerschnitzel employee, had waited on him about once a week and remembered him because of his habit of harassing service employees by changing his orders. Defendant's gun, which contained his own fingerprint, was the murder weapon. Defendant's cousin had testified against him, recounting defendant's own statements and actions, which both placed him at the scene of the crime and showed his consciousness of guilt in fleeing from police after he returned there. Defendant then testified on his own behalf, denying he was even present and suggesting someone had somehow planted his fingerprint. Defense counsel had only one realistic chance—to discredit the robbery evidence—and faced the likely prospect that defendant's own testimony had destroyed his credibility beyond rehabilitation. From a tactical point of view, it was, to say the least, an uphill battle.

In light of the evidence, counsel elected to concede his client's presence at the scene (a fact no one but defendant disputed) and to explain his client's

contrary testimony as a failure of recollection. Defendant's testimony provided support for the strategy: he professed failure of recollection numerous times while on the stand. Counsel attacked the robbery and robbery special-circumstance charges, maintaining defendant did not have the requisite intent to steal and did not in fact steal. These arguments were proper and related to the elements of the crimes as disclosed in the instructions given to the jury. Under these circumstances, we cannot say counsel was constitutionally ineffective in his attempt to make the best of a bad situation. (*People* v. *Jackson* (1980) 28 Cal.3d 264, 292-293 [168 Cal.Rptr. 603, 618 P.2d 149].)

Unlike *People* v. *Diggs* (1986) 177 Cal.App.3d 958, 970-971 [223 Cal.Rptr. 361], relied on by defendant, there is a "plausible tactical explanation" for the defense argument in this case, as we have shown. In addition, as the People observe, counsel's contention that defendant lacked the specific intent to rob was not an improper attempt to proffer a defense of diminished capacity, but a proper argument on an element of a charged offense.

Moreover, defendant fails to show prejudice in light of the evidence against him. Defendant does not establish that he was deprived of any potentially meritorious defense nor does he show to a reasonable probability that the result would have been different in the absence of any alleged ineffectiveness. (*Strickland* v. *Washington, supra,* 466 U.S. at pp. 687-689 [80 L.Ed.2d at pp. 693-695]; *People* v. *Ledesma, supra,* 43 Cal.3d at pp. 215-218.)

PENALTY PHASE CONTENTIONS

XIX. *Failure to Instruct the Jury Regarding Deliberations When an Alternate Juror Is Substituted*

With the consent of both sides, Juror Collins was discharged during the penalty phase trial, but before deliberations began, so she could take her vacation. Alternate Juror Lorenz was substituted in her place. Lorenz heard all the evidence at the guilt and penalty phases and participated in all penalty phase deliberations.

Defendant argues the court's failure to give sua sponte instructions: (1) requiring the jury to begin anew all deliberations (including guilt phase deliberations), and (2) to consider "lingering doubt" in mitigation of the penalty, constituted prejudicial error. As defendant acknowledges, we have already rejected his argument that all past deliberations must be set aside when an alternate juror is substituted before the penalty phase begins; he

offers no sound reason for reconsideration of our decisions on this point. (*People* v. *Hernandez* (1988) 47 Cal.3d 315, 339 [253 Cal.Rptr. 199, 763 P.2d 1289]; *People* v. *Brown* (1988) 46 Cal.3d 432, 461 [250 Cal.Rptr. 604, 758 P.2d 1135].) We have also held that a sua sponte lingering doubt instruction is not required; we perceive no reason in the facts of this case to depart from our decisions in this regard. (*People* v. *Sully* (1991) 53 Cal.3d 1195, 1245 [283 Cal.Rptr. 144, 812 P.2d 163]; *People* v. *Cox* (1991) 53 Cal.3d 618, 676 [280 Cal.Rptr. 692, 809 P.2d 351].)

## XX. *Evidence of Other Crimes*

■ Defendant contends the admission of evidence of his prior felony conviction for involuntary manslaughter and of unadjudicated incidents of felony assault violated his state and federal constitutional rights to due process, equal protection, freedom from being placed twice in jeopardy, and to a rational and reliable penalty phase decision.

Initially, defendant does not demonstrate that objections to penalty phase evidence on these grounds were made in the trial court; therefore, he has waived his right to advance any such contentions here. (Evid. Code, § 353.) Moreover, as defendant acknowledges, we have repeatedly rejected similar arguments. (*People* v. *Medina, supra,* 51 Cal.3d at pp. 906-907; *People* v. *Heishman* (1988) 45 Cal.3d 147, 192 [246 Cal.Rptr. 673, 753 P.2d 629]; *People* v. *Gates* (1987) 43 Cal.3d 1168, 1203 [240 Cal.Rptr. 666, 743 P.2d 301]; *People* v. *Balderas* (1985) 41 Cal.3d 144, 204-205 [222 Cal.Rptr. 184, 711 P.2d 480].) Defendant's presentation affords no reason for reconsideration of our decisions; his argument is rejected on all stated constitutional and nonconstitutional grounds.

Defendant also makes various fact-specific arguments against the admission of particular other-crimes evidence at the penalty phase. None has merit; in each case, jury consideration of the evidence was appropriate, if not essential, in the course of a normative assessment of defendant's conduct. (*People* v. *Gates, supra,* 43 Cal.3d at p. 1203.)

■ Defendant maintains the jury should not have been allowed to hear evidence that: (1) he attacked Walter Lieb in an incident occurring before the one in which Lieb attacked him; (2) he killed Lieb; and (3) he was convicted of involuntary manslaughter. The challenged evidence served to place in context defendant's role in the incidents; there was no danger of prejudice or "relitigation" of the manslaughter conviction, particularly in light of the trial court's order precluding the prosecutor from arguing intentional homicide, its explicit instruction that defendant was convicted *only* of involuntary

manslaughter, and its description of the elements of that offense. Defendant's further assertion that the evidence improperly suggested "gang-related" activities is pure speculation.

■ Defendant also complains of the admission of what he calls "false evidence" regarding the extent of the injuries suffered by another of his victims, Daniel Malcher. Malcher testified that defendant kicked Malcher's motorcycle, causing it to fall on Malcher's right knee and knocking him to the ground. Malcher further testified defendant kicked him in the face, head, and ribs while he was down. Malcher's knee was dislocated; he testified he had to have arthroscopic surgery on all four ligaments of the knee, including removal of cartilage, as a result of his injuries. According to Malcher, he was still suffering from the knee injury at the time of trial.

Defendant calls Malcher's testimony that his knee was "destroyed" a false statement, pointing to medical records suggesting preexisting injury as well as other mitigating factors. Although perhaps hyperbole, Malcher's characterization of his injury did not prejudice defendant, particularly in view of the evidence of serious and permanent injury from the incident.

■ Defendant also asserts error in the admission of Malcher's testimony that defendant yelled at him, "You F . . . ing honkies. We're sick of you're [*sic*] shit," claiming the testimony exploited the cross-racial nature of the incident and caused the jury to aggravate the penalty based on impermissible racial considerations. In support of his position, defendant points to several questions asked by the prosecutor which elicited responses that "honky" means "White person" and that defendant had used the word on other occasions.

The claim is spurious. The prosecutor was entitled to elicit the facts surrounding defendant's assault on Malcher; the racial epithet came from defendant's own mouth. Moreover, defendant points to nothing in the record suggesting this part of the incident was unduly exploited by the prosecutor in argument.

Finally, defendant assails the age of the evidence of defendant's assault on Andre McMorris and his brother in 1980, observing it exceeded the statute of limitations for prosecuting the crime. We have previously addressed and rejected similar arguments and perceive no reason to reconsider our decisions in this regard. (*People* v. *McDowell* (1988) 46 Cal.3d 551, 568-569 [250 Cal.Rptr. 530, 758 P.2d 1060]; *People* v. *Heishman, supra,* 45 Cal.3d at p. 192.) Moreover, defendant does not demonstrate prejudice—he points to nothing in the record showing that he was unable to respond to evidence of the McMorris incident because of the passage of time.

XXI. *Testimony of the Prosecution Psychiatrist That Defendant Refused to Cooperate in an Examination*

Defendant presented the testimony of two expert psychiatrists as to his mental condition; their testimony was based in part on extensive interviews and psychological testing of defendant. The prosecutor requested that a prosecution psychiatrist be permitted to examine defendant before testifying in rebuttal. Defense counsel objected and further indicated he would advise his client to refuse to communicate with the prosecution psychiatrist. The court ordered the examination, whereupon defendant did so refuse. The court then permitted the psychiatrist to testify regarding defendant's refusal to participate in the examination.

 Defendant claims his federal Fifth and Sixth Amendment constitutional rights were violated by this scenario and further claims a violation of Evidence Code sections 350 and 352. We disagree. By tendering his mental condition as an issue in the penalty phase, defendant waived his Fifth and Sixth Amendment rights to the extent necessary to permit a proper examination of that condition. Therefore, those rights were not violated when the examining psychiatrist testified to defendant's refusal to cooperate. (*Buchanan* v. *Kentucky* (1987) 483 U.S. 402 [97 L.Ed.2d 336, 107 S.Ct. 2906]; see also *People* v. *Poggi* (1988) 45 Cal.3d 306, 330 [246 Cal.Rptr. 886, 753 P.2d 1082]; *People* v. *Williams, supra,* 44 Cal.3d 883, 961-962.) Any other result would give an unfair tactical advantage to defendants, who could, with impunity, present mental defenses at the penalty phase, secure in the assurance they could not be rebutted by expert testimony based on an actual psychiatric examination. Obviously, this would permit and, indeed, encourage spurious mental illness defenses.

XXII. *Evidence of Defendant's Threat to "Go Crazy" in the Courtroom*

 Officer Watkins, one of defendant's jailers, testified that during a noon recess between preliminary hearing sessions, defendant banged on the door of his cell and demanded to be taken back to the jail for lunch. Defendant told the officer that if he did not get his lunch, he was "going to act crazy" in court. Defendant points to no objection to this evidence in the trial court; he has, therefore, waived the right to challenge its admission on appeal. (Evid. Code, § 353.) Moreover, contrary to defendant's argument, the evidence permits an inference of a purposeful feigning of mental illness and was, therefore, proper rebuttal to evidence of mental illness. Defendant was permitted to cross-examine the officer and to argue to the jury contrary inferences that might be derived from his testimony. Neither error nor prejudice appears.

XXIII. *Failure to Specify Mental Illness as a Mitigating Circumstance*

■■■ Defendant argues the court's instructions allowed the jury to use mental illness as an aggravating factor (see § 190.3, factor (d)) in violation of the Eighth Amendment to the federal Constitution. He points to the court's failure to label mental illness as a mitigating factor in its charge to the jury and its further instruction that jurors were to determine whether each of the listed factors was aggravating or mitigating.

As we held in *People* v. *Benson* (1990) 52 Cal.3d 754, 801-803 [276 Cal.Rptr. 827, 802 P.2d 330], penalty phase jury instructions need not explicitly label a particular factor such as extreme mental or emotional disturbance as mitigating. The test is whether there is a "reasonable likelihood that the jury . . . understood the charge" in a manner that violated defendant's rights. (*Id.* at p. 801; *Boyde* v. *California* (1990) 494 U.S. 370 [108 L.Ed.2d 316, 110 S.Ct. 1190]; see also *People* v. *Kelly* (1992) 1 Cal.4th 495, 525-526 & fn. 7 [3 Cal.Rptr.2d 677, 822 P.2d 385] [reaffirming *Boyde* test].)

No such "reasonable likelihood" is present here. Nothing in the charge suggested or implied that mental illness was an aggravating factor. The jury was told that it could act in response to feelings of sympathy and compassion if "any of the factors" evoked those feelings. A reasonable juror viewing the instructions as a whole would not have inferred that mental illness was a circumstance in aggravation or an indicium of future dangerousness. (*Benson, supra,* 52 Cal.3d at p. 802.)

The final arguments of the parties reinforced this view. The defense argued that mental illness was present and mitigated the offense. The prosecution did not dispute the mitigating effect of mental disturbance; it argued only that defendant was not under the influence of any such disturbance at the time the offense was committed. From the record, it appears defendant was fully accorded his Eighth Amendment right to a fair determination of penalty.[2]

---

[2]Moreover, the instruction stating "the factors . . . may be considered by you, if applicable, as either aggravating or mitigating factors" was drafted and submitted by defendant as part of Defense Special Instruction No. 16. During argument on jury instructions, defense counsel expressly affirmed that he wanted the instruction given in the precise manner it was given by the court. Because the court had no sua sponte duty to instruct in a manner contrary to defendant's request, an appellate attack on the instruction as requested is barred by the doctrine of invited error. (*People* v. *Marshall, supra,* 50 Cal.3d 907, 931-932.)

XXIV. *Failure to Give Defendant's Instruction Deleting "Extreme" From Mental Illness*

 The trial court denied defendant's request that it instruct the jury to consider as a mitigating circumstance "whether the offense was committed while the defendant was under the influence of *any mental or emotional disturbance.*" (Italics added.) In denying the request, the trial court reasoned the matter was covered by its instruction, based on section 190.03, factor (d), listing as a factor to be considered in the penalty assessment: "Whether or not the offense was committed while the defendant was under the influence of *extreme mental and emotional distress.*" (Italics added.)

We have rejected arguments similar to defendant's in numerous cases, observing in part that section 190.03, factor (k) (the "factor (k)" instruction), allows the jury to consider a virtually unlimited range of mitigating circumstances. (*People* v. *Benson, supra,* 52 Cal.3d at pp. 803-804; *People* v. *Medina, supra,* 51 Cal.3d at p. 908; *People* v. *Ghent, supra,* 43 Cal.3d at p. 776.)

The jury was instructed in accordance with section 190.3, factor (k) that it could consider "any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime and any sympathetic or other aspect of defendant's character, background or record that the defendant offers as a basis for a sentence less than death, whether or not related to the offense for which he is on trial. You must disregard any jury instruction given to you in the guilt or innocence phase of this trial which conflicts with this principle." In view of this instruction, there was no reasonable likelihood the jury did not fully and fairly consider defendant's mental illness as a possible mitigating factor. (*People* v. *Benson, supra,* 52 Cal.3d at p. 804.)

XXV. *CALJIC No. 8.84.1 and the Applicable Penalty Factors*

 Defendant contends the giving of CALJIC No. 8.84.1, listing the statutory penalty factors, violated his statutory and constitutional rights because four of the factors were allegedly inapplicable to this case. He also contends the entire penalty factor statute is unconstitutional. We have repeatedly rejected similar contentions and perceive no basis for reconsidering our numerous decisions in this regard. (See, e.g., *People* v. *Wright* (1990) 52 Cal.3d 367 [276 Cal.Rptr. 731, 802 P.2d 221]; *People* v. *Murtishaw* (1989) 48 Cal.3d 1001, 1033 [258 Cal.Rptr. 821, 723 P.2d 172]; *People* v. *Allison*

(1989) 48 Cal.3d 879, 906-907 [258 Cal.Rptr. 208, 771 P.2d 1294].) The jury was told to consider particular factors "if applicable"; there is no reasonable likelihood that any juror confusion resulted in a misapplication of any factor in this case. (*Boyde* v. *California, supra,* 494 U.S. at pp. 380-381 [108 L.Ed.2d at pp. 328-330, 110 S.Ct. at p. 1198].) Defendant's claims of error are rejected.

XXVI. *CALJIC No. 8.84.2*

The court's instructions to the jury included the following modified version of CALJIC No. 8.84.2:

"It is now your duty to determine which of the two penalties, death or confinement in the state prison for life without possibility of parole, shall be imposed on the defendant. After having heard all of the evidence and after having heard and considered the arguments of counsel, you shall consider, take into account, and be guided by the applicable factors of aggravating and mitigating circumstances upon which you have been instructed. The weighing of aggravating and mitigating circumstances does not mean the mere mechanical counting of factors on each side of an imaginary scale or the arbitrary assignment of weights to any of them.

"You are not required to place any specific weight or numerical value on any particular aggravating or mitigating circumstance. You are free to assign whatever moral or sympathetic value you deem appropriate to each and all of the various factors you are permitted to consider. It is entirely up to you to determine whether in your independent opinion one or more factors outweigh others no matter what their number. In weighing the various circumstances, you simply determine under the relevant evidence which penalty is justified and appropriate by considering the totality of the aggravating circumstances with the totality of the mitigating circumstances.

"In weighing the aggravating and mitigating factors, you are not to merely count numbers on either side. One mitigating circumstance may be sufficient to support a decision that death is not the appropriate punishment in this case. Likewise, one aggravating circumstance may be sufficient to support a decision that death is the appropriate punishment in this case.

"If any of the factors or circumstances arouses sympathy or compassion in you to such an extent as to persuade you that death is not the appropriate punishment, you may act in response to those feelings of sympathy and

compassion and impose life without possibility of parole. However, in order to return a judgment of death, each of you must be persuaded that the aggravating evidence and circumstances are so substantial in comparison with the mitigating that it warrants death as the appropriate punishment instead of life without parole."

■ Defendant contends the instruction: (1) failed to adequately explain the determinations necessary to impose the death penalty; (2) misled jurors as to their discretion to impose a sentence of death; and (3) was vague and ambiguous and created a presumption in favor of death. We find the instruction adequate to inform the jury of its sentencing responsibilities; its use violated none of defendant's rights under state or federal law.

■ Contrary to defendant's argument, the jury need not determine the absolute weight of the aggravating circumstances, but need only exercise its discretion and moral judgment in weighing the aggravating circumstances against the mitigating circumstances. (*Boyde* v. *California, supra,* 494 U.S. at pp. 376-378 [108 L.Ed.2d at pp. 326-328, 110 S.Ct. at p. 1196].) ■ Moreover, the trial court in this case instructed the jury that it could act in accordance with feelings of sympathy and compassion "if any of the factors or circumstances arouses sympathy or compassion in you to such an extent as to persuade you that death is not the appropriate punishment." Especially in view of this modification, there was no reasonable likelihood the jury was confused or misconstrued its function. (*Ibid.*; see also *People* v. *Whitt* (1990) 51 Cal.3d 620, 651 [274 Cal.Rptr. 252, 798 P.2d 849].) Finally, the verdict form returned by the jury included an express finding that the aggravating circumstances "substantially outweigh[ed]" the mitigating ones.

■ Moreover, we reject defendant's suggestion that the words "so substantial" in the sentence: "To return a judgment of death each of you must be persuaded that the aggravating evidence and circumstances are *so substantial* in comparison with the mitigating circumstances that it warrants death instead of life without parole" were excessively subjective and unfairly detrimental to his cause. (Italics added.) The emphasized words plainly convey the importance of the jury's decision and emphasize that a high degree of certainty is required for a death verdict. Far from undermining defendant's cause at the penalty phase, they assisted defense counsel in emphasizing the gravity of the jury's task, which included the choice of death as a penalty.

For the reasons stated above, each of defendant's challenges to the language of the penalty deliberation instruction is rejected on all legal grounds offered.

## XXVII. *Defendant's Proposed Special Instruction on Mercy*

The trial court declined to give defendant's proposed instruction that the jury might exercise "mercy" in its penalty determination. In refusing the instruction, it observed: (1) the proposed instruction is misleading in that it fails to make reference to statutory factors and implies an unguided or arbitrary discretion in the jury to render a greater or lesser penalty at its whim; and (2) the given instructions focusing on sympathy and compassion in relation to the circumstances more precisely and adequately cover the area. Both observations were apt. The unadorned use of the word "mercy" implies an arbitrary or capricious exercise of power rather than reasoned discretion based on particular facts and circumstances. Defendant was not entitled to a pure "mercy" instruction. (*People v. Daniels* (1991) 52 Cal.3d 815, 885 [277 Cal.Rptr. 122, 802 P.2d 906]; *People v. Benson, supra,* 52 Cal.3d at pp. 808-809; *People v. Andrews* (1989) 49 Cal.3d 200, 227-228 [260 Cal.Rptr. 583, 776 P.2d 285].)

## XXVIII. *Defendant's Proposed Instruction as to Burden of Proof at Penalty Phase*

We have previously rejected defendant's argument the court is required to give an instruction that a reasonable doubt as to penalty requires a verdict of life in prison without possibility of parole. (*People v. Daniels, supra,* 52 Cal.3d at p. 886; *People v. Rodriguez* (1986) 42 Cal.3d 730, 777-779 [230 Cal.Rptr. 667, 726 P.2d 113].) Defendant offers no sound basis for reconsideration of these decisions.

## XXIX. *The Automatic Motion for Reduction of Penalty*

Defendant contends the court erred in denying his automatic motion to modify the death penalty verdict (§ 190.4, subd. (e)), as well as posttrial motions for a new trial and acquittal (§ 1181). He points to certain remarks made by the court which he contends were inconsistent with the robbery-murder special-circumstance finding. We disagree.

Defendant acknowledges the court's explicit statement as follows: "The Court notes and considers that this murder was done to effectuate robbery which means purely selfish gain by force." Thus, the court was well aware of the robbery-murder special circumstance; it clearly and explicitly endorsed the jury's finding in that respect.

The court's other remarks, e.g., its references to motives of "pure thrill of extinguishing human life" and a desire to "eliminate the most damaging

witness of the crime" are not inconsistent with the robbery-murder finding. In the course of a robbery and to further his commission of the robbery, a defendant may kill callously or to eliminate witnesses or with multiple purposes or motivations. (*People* v. *Stankewitz* (1990) 51 Cal.3d 72, 101 [270 Cal.Rptr. 817, 793 P.2d 23].) So long as he has killed "in order to advance an independent felonious purpose" (*People* v. *Morris, supra*, 46 Cal.3d at p. 21; italics omitted), the special circumstance is present.

We are satisfied the evidence more than adequately supports the jury's verdict that defendant killed in order to advance such a purpose, i.e., a robbery, and that the trial court independently and correctly reached the same conclusion in ruling on all posttrial motions. (*People* v. *Lang* (1989) 49 Cal.3d 991, 1045 [264 Cal.Rptr. 386, 782 P.2d 627].) There was no error in the denial of any of these motions.

## DISPOSITION

For the reasons stated above, we find no reversible error in the record. The judgment of death is affirmed in its entirety.

Panelli, J., Kennard, J., Arabian, J., Baxter, J., and George, J., concurred.

**MOSK, J.**—I dissent.

Prior to trial, on defense counsel's motion the court declared a doubt about defendant's mental competence and instituted proceedings on the question under the authority of the statutory scheme codified in Penal Code section 1367 et seq. One of the provisions of that scheme is Penal Code section 1369, subdivision (f), which allocates the burden of proof to the defendant: "It shall be presumed that the defendant is mentally competent unless it is proved by a preponderance of the evidence that the defendant is mentally incompetent." The parties introduced substantial evidence on the issue. The court subsequently determined that defendant was in fact competent.

The statutory scheme on mental competence is fundamentally flawed in its allocation of the burden of proof to the defendant, and as a result cannot support a determination of competence made under its "authority." The reason is plain. The provisions violate the guaranty of due process of law under article I, section 15 of the California Constitution. (Cf. *People* v. *Medina* (1990) 51 Cal.3d 870, 913-914 [274 Cal.Rptr. 849, 799 P.2d 1282]

(dis. opn. of Mosk, J.) [analyzing the question under the due process clause of U.S. Const., Amend. XIV], affd. *sub nom. Medina* v. *California* (1992) __ U.S. __ [120 L.Ed.2d 353, 112 S.Ct. 2572].)

Accordingly, I would reverse the judgment in its entirety.[1]

Appellant's petition for a rehearing was denied September 23, 1992, and the opinion was modified to read as printed above. Mosk, J., was of the opinion that the petition should be granted.

---

[1]Because of this result, I need not and do not reach any other question.

In passing, I note that the court's denial of defendant's motion to suppress his handgun was manifestly erroneous. Defendant claimed the weapon was seized during an unreasonable search of the home of some relatives, with whom he had been staying as an overnight guest. In opposition, the People asserted lack of standing: defendant, they urged, did not have a legitimate expectation of privacy in the premises. The court denied relief on that basis. It was wrong. In *Minnesota* v. *Olson* (1990) 495 U.S. 91 [109 L.Ed.2d 85, 110 S.Ct. 1684], the United States Supreme Court held that "an overnight guest" does in fact have a "legitimate expectation of privacy in his host's home" (*id.* at pp. 98-100 [109 L.Ed.2d at pp. 94-96, 110 S.Ct. at p. 1689]), and that he does so simply by reason of his "status" as such (*id.* at pp. 96-98 [109 L.Ed.2d at pp. 92-94, 110 S.Ct. at p. 1688]).

It seems plain to me that defendant also had a legitimate expectation of privacy *in his handgun*. The majority disagree. But the conduct they deem to be defendant's relinquishment of his privacy interest against the government cannot be so characterized. His entrusting of the weapon to his cousin was a *concealment* and not a *disclosure*. All the same, the point is of no consequence. The presence or absence of a legitimate expectation of privacy by defendant in his handgun was not the basis on which the parties litigated the issue and the court made its decision. Hence, it simply cannot be used to support the ruling after the fact. Fairness forbids.