Filed 10/29/20  P. v. Paisano CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE, | C085158 |
| Plaintiff and Respondent, | (Super. Ct. Nos. STKCRFE20150007132, SF132053A) |
| v. | |
| NORMA PAISANO, | |
| Defendant and Appellant. | |

SUMMARY OF THE APPEAL

A jury found defendant Norma Paisano guilty of the murder of Kwasi Mahan; the attempted murders of Ursula Herron, Apondo White, and Arthur Jones; and guilty of possessing a firearm when she was a felon prohibited from carrying a firearm.  The jury also found true various firearm enhancements to those crimes.  Additionally, based on

1

evidence regarding the presence of drugs when the police arrested defendant for the shooting, the jury found defendant guilty of possessing cocaine and methamphetamine for sale. At a bifurcated hearing, the judge found true allegations that the defendant had committed a prior serious felony (i.e., that defendant had a strike on her record), that defendant had not been out of prison following time served on the prior serious felony for a period of five years at the time she committed the offenses, and that defendant was out on bail in another pending criminal matter at the time she committed the charged crimes. The trial court sentenced defendant to 205 years and eight months to life.

On appeal, defendant raises a number of arguments. First, defendant argues her entire conviction must be reversed because the trial court did not dismiss a juror when it discovered during the trial that the juror was acquainted with one of the People's witnesses. Second, defendant makes three arguments challenging the sufficiency of the evidence in support of her attempted murder convictions and an enhancement to one of those convictions. Third, defendant argues the trial court abused its discretion when it declined her request at the sentencing hearing to dismiss her strike prior. Fourth, defendant argues we should remand this case for resentencing in order to allow the trial court to exercise its discretion afforded the court as a result of amendments to the law after judgment. Fifth, she argues the trial court erred in not staying a sentencing enhancement it imposed pursuant to Penal Code section 12022.1 (unless otherwise stated all statutory section references that follow are to the Penal Code), which adds time to a sentence when a court finds a defendant committed a crime while out on bail for the alleged commission of another crime. Sixth, and finally, she argues the trial court erred in not awarding her presentence custody credits for time served.

We disagree with defendant on her first four categories of arguments, but agree with her on the fifth and sixth. We will remand the matter to the trial court for resentencing.

FACTS AND PROCEDURAL HISTORY

*The Shooting*

On July 18, 2015, a church group that goes by the name "Hope Dealers" was gathered at the corner of Hunter and Sonora in Stockton to distribute clothing, toiletries, and other necessities to the homeless. Desmond Griffin, a Hope Dealer, was sitting in the back of a truck icing an injured ankle. Deryl George, another Hope Dealer, was there with his nephew. There were a lot of people around, including a group that included Herron, and Jones. Jones was sitting on his bike and looking for his uncle.

A black Buick Lacrosse drove up the street, and a woman, later identified by witnesses as the defendant, jumped out of the car holding a gun. Defendant began shooting. Griffin testified that she pointed the gun at a group of people and that, after defendant fired the second shot into the group, the group started to run. As the crowd moved defendant moved, too. Griffin described her as "sidestepping . . . and shooting as they were running." She squatted in the intersection, extended her arms, and shot, pointing at the people who were running. Griffin observed that she was "[d]etermined. . . . It looked like she had an agenda. She had a focus." He could not tell if the shooting "was personal," but he observed she was pointing and firing at the people who were running, and "was shooting with the crowd because the crowd didn't run in a straight line. . . . She was very focused on what she was shooting at." George thought that defendant "knew what she was doing. She didn't point . . . where . . . my crew was at. . . . She was aiming down the street." At trial, one officer testified that Herron told him defendant had pointed the gun towards her and Mahan. Another officer indicated that Herron told him later in the day of the shooting that defendant had been going after her ex-boyfriend, and she and Mahan were in defendant's way.

Mahan, injured, fell to the ground, bleeding and gasping for air. Defendant shot Herron in her side as Herron ran to a vacant lot. Jones ran to an empty lot, and by the

3

time he reached it defendant had shot him in the right arm. Griffin testified it appeared another black man in the area was shot in the thigh.

The Buick pulled back up, and the driver told defendant to get in. Defendant fired about two more shots, emptying her clip, and got in the Buick, which then drove away. Griffin estimated that defendant fired between seven and 10 shots total from the time she got out of the car to the time she got back in.

*The Victims' Injuries*

After the shooting stopped, Jones got his bike, went to his truck, and drove himself to St. Joseph's Hospital. Jones's arm had two bullet holes in it. Jones's treatment included two surgeries, wearing a brace for two to three weeks, and physical therapy. The wound and surgeries left Jones with one scar the size of a quarter, one the size of a nickel, and one from his wrist to his elbow. At the time of the trial, in March 2017, Jones's arm would still get a little sore sometimes.

Once defendant left, Herron returned to the place where she was when the shooting began to look for her companions. They told her to lie down while they called 9-1-1. Herron was taken by ambulance to a local emergency room, having suffered a wound to her right abdomen. Emergency room doctors took x-rays and saw that the bullet had left Herron's body.

Dr. Basson Ghobrial, who examined Herron, testified that upon admission, Herron was classified as a "tier one," which was the designation for the most severe injuries, but her vital signs were stable and there were no critical organs in the area of her wound.

Herron was crying and reported her pain at a 10 out of 10. Dr. Ghobrial said the wound "just went through superficial[,] what we call subcutaneous[,] tissue, all superficial, no vital organs, so she did not require any surgical intervention. We usually just provide care for the--for the wounds, we call that a wet/dry dressing. We clean it.

4

We give her antibiotics as well as a tetanus shot, and then we dress the wound." Herron did not receive stitches.

The doctors wanted to admit Herron to the hospital, but she signed out against medical advice and left. Herron has three scars as a result of her injury that are bigger than an inch, but at the time of trial reported she no longer felt pain as a result of the gunshot wound.

Mahan was taken to the emergency room by ambulance, and he died as a result of his gunshot wounds.

Officer Luis Talamontes went to the location of the shooting shortly after it happened. Talamontes testified he spoke to a man who appeared to be injured, whom he identified from a photograph at trial as Apondo White. Talamontes described the victim as "a black male, about five six, five seven. His pants were ripped and he was limping around, and he had an injury to his inner right thigh. It appeared to be either--it appeared to be a grazing wound or it looked similar to road rash but is really sharp. But he was very uncooperative, didn't want to speak to the police. He was upset." Talamontes said he noticed White because he "was limping. . . . I can't remember what he was saying, but he was being loud."

Talamontes testified that he has seen many gun injuries during his career, and White's injury appeared consistent with a gunshot wound. The wound was bright red, and though Talamontes could not see blood, the wound looked wet. White's pants looked torn and cut. The Stockton Police Department was unable to locate White for a statement, and he did not testify.

*Drug Possession*

Defendant was located and taken into custody on July 27, 2015. When police apprehended defendant, she had just exited a car she had been driving. When detectives searched the car, they found nine baggies of crystals and one of a white powder in the

5

center console.  A senior criminologist for the Department of Justice tested the substances, and found the crystals contained methamphetamine and the powder contained cocaine.  Officers also found a purse containing $119.36 in small bills in the car.  At trial, Detective Jimmy Fritts testified as a narcotics expert for the People.  He testified that the crystal baggies appeared to be set up for sale, and that the powdered substance looked set up as one dose.  Based on the facts presented regarding the drugs found and the denominations of the bills in the purse, Fritts indicated he believed the substances were possessed with the intent to sell and distribute them.

*Legal Proceedings*

The People filed an information against defendant that alleged nine counts.  Counts six and nine were later dismissed.  The remaining counts were as follows:  Count one alleged defendant murdered Mahan (§ 187, subd. (a)).  It also alleged defendant committed count one willfully, deliberately, and with premeditation within the meaning of section 189, and that the act was a serious felony within the meaning of section 1192.7, subdivision (c).  Counts two, three, and four charged defendant with the attempted murders of Herron, White, and Jones, respectively (§§ 664/187, subd. (a)).  Count five alleged defendant was a felon in possession of a firearm in violation of section 29800, subdivision (a)(1).  Count seven alleged that defendant had possessed cocaine for sale pursuant to Health and Safety Code section 11351.  Count eight alleged that defendant had possessed methamphetamine for sale pursuant to Health and Safety Code section 11378.  The jury found defendant guilty on all charges; determined that the murder of Mahan was first degree murder; and concluded that defendant acted willfully, with deliberation, and with premeditation in the attempted murders of Herron, Jones, and White.

Counts one, two, and four included enhancement allegations that defendant personally used a firearm causing death--or great bodily injury as defined by section

6

12022.7—within the meaning of section 12022.53, subdivision (d). Count three included an allegation that defendant intentionally discharged a firearm within the meaning of section 12022.53, subdivision (c), personally used a firearm within the meaning of section 12022.53, subdivision (b), and personally used a firearm within the meaning of section 12022.5, subdivision (a)(1). Counts two, three, and four also included other firearm enhancements that provide for shorter sentence enhancements than the ones provided for by the enhancements mentioned above.

Counts two and four alleged as an enhancement that defendant inflicted great bodily injury on Herron and Jones, respectively, within the meaning of section 12022.7, subdivision (a), causing the crimes to be serious felonies as set forth in section 1192.7, subdivision (c)(8). The jury found these enhancement allegations true, with the exception of the section 12022.7 enhancement alleged under count two.

The information also alleged that, due to a prior conviction for first degree burglary within the meaning of section 459, defendant was a repeat offender as contemplated by section 667, subdivision (a)(1). It also alleged that the burglary conviction was for a serious felony (a strike) within the meaning of section 1170.12, subdivision (b), and section 667, subdivision (d)), as set forth in California's "Three Strikes and You're Out" law (the Three Strikes Law).

The information also alleged that at the time of the shooting, defendant had previously served a prison sentence as a result of the aforementioned burglary, and had failed to remain free from prison custody for five years within the meaning of section 667.5, subdivision (b). Finally, the information alleged that at the time of the shooting, defendant was released from custody on her own recognizance or on bail in another matter for the crime of possession of a controlled substance within the meaning of section 4573.8 in violation of section 12022.1. At a bifurcated trial, the court found all of these allegations to be true.

7

At the sentencing hearing, the court refused to exercise its discretion to strike her prior serious felony conviction, under section 1385 and *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497.

The trial court imposed a sentence of 205 years and eight months to life calculated as follows: Because the court found true the allegation that defendant had a prior strike, it doubled the base sentence imposed for each crime, resulting in a base sentence of 50 years to life for the murder, 14 years to life for each of the three attempted murders (for a total of 42 years on the attempted murders), one year and four months for possession of a firearm by a felon, six years for the possession of cocaine for sale, and one year and four months for the possession of methamphetamine for sale, adding up to a base sentence of 100 years and eight months.

For the enhancements due to prior contacts with the criminal justice system, as to count one the trial court added five years due to the repeat-offender finding within the meaning of section 667, subdivision (a)(1), and two years due to the fact that at the time of the shooting she had been released on bail in another pending action within the meaning of section 12022.1.

With respect to the firearm enhancements alleged under counts one, two, three, and four, the trial court added to defendant's sentence the penalty imposed for the firearm enhancement carrying the highest penalty, then stayed the penalty on the firearm enhancements that contained lesser penalties. As such, the court imposed a 25-year sentence each for the section 12022.53, subdivision (d) enhancements to counts one, two, and four, and a 20-year enhancement for the section 12022.53, subdivision (c) enhancement to count three. Finally, the trial court added three years to the sentence on count three for the finding that defendant inflicted great bodily injury on Jones within the meaning of section 12022.7, subdivision (a). With the exception of the punishments stayed for the lesser included firearm enhancements, the trial court imposed all base sentences and enhancements consecutively.

8

I

*The Trial Court Did Not Abuse Its Discretion When It Did Not Excuse Juror No. 8*

Defendant argues the trial court abused its discretion when it did not discharge Juror No. 8 after trial had started and the court discovered that (1) Juror No. 8 was acquainted with Detective Jimmy Fritts, and (2) Juror No. 8 had not disclosed the acquaintance during jury selection process. We disagree. Here, once it discovered the acquaintance between Juror No. 8 and Detective Fritts, the trial court properly questioned Juror No. 8 and received sufficient assurance that he was capable of listening to the evidence and deciding the case impartially despite that acquaintance. Nothing in the record suggests that Juror No. 8's assurances were unworthy of belief, such that there was good cause to remove him, or the failure to excuse him violated defendant's right to an impartial jury. On the record before us, we conclude that substantial evidence supports the trial court's exercise of discretion to retain Juror No. 8, as nothing suggests that Juror No. 8 was actually biased or unable to perform his duties as a demonstrable reality.

A. *Additional Facts*

As part of the voir dire process, potential jurors reviewed a list of names of potential witnesses. The potential witness list identified "Officer Jimmy Fritz - Narcotics Expert" as potential witness number 24. This spelling of the witness's name was incorrect. The correct spelling of his last name is "Fritts." None of the potential jurors indicated they knew a Detective Fritz--or Fritts--during voir dire.

On March 16, 2017, before Detective Fritts testified, the People told the trial court that "Detective Fritts approached me right now. Apparently he was out in the hallway. One of our jurors . . . approached him saying, '[h]i Jimmy, how are you?' ¶ Detective Fritts is familiar with him, but doesn't . . . know him or know his name; is that correct?" Detective Fritts responded, "I don't recall his name." Detective Fritts elaborated, "I

know he's the grandfather of one of my daughter's best friends. . . . I met him occasionally the last eight, ten years. One time I went hunting with her father and him, five, six years ago. I know his face. I believe his last name is Cooper. [My Daughter's friend's] father's name is Scott Cooper. . . . [I]t could be the mother's father." The trial judge then noted that none of the jurors were named Cooper. When the trial court pointed out no one indicated they knew Detective Fritts when they saw the potential witness list, Detective Fritts stated, "I'm not sure he recalls my last name. When we met, it was, hey, Jim."

In light of Detective Fritts's statements, defense counsel said he would like to meet in chambers with Juror No. 8, and the court agreed. When the court asked Juror No. 8 if he knew Detective Fritts, he responded "I do." Juror No. 8's description of his connection with Detective Fritts differed from the one Detective Fritts provided. Juror No. 8 indicated that "[h]is daughter is married to my nephew." When asked about the nature of his relationship with Detective Fritts, Juror No. 8 indicated, "I seen him maybe once a year maybe, Thanksgiving, Christmas, family get-together." The court asked Juror No. 8 if he spoke with Detective Fritts about his work at all, and Juror No. 8 responded, "I barely know the guy." When the court asked if Juror No. 8 felt anything about his relationship with Detective Fritts made him feel he could not be fair to both sides, Juror No. 8 responded "[n]o." When the court asked Juror No. 8, "[i]f you were to return a verdict of not guilty, would you be uncomfortable at all in talking with him about your experience as a juror?" Juror No. 8 responded, "[n]o."

The trial court then gave defense counsel the opportunity to ask Juror No. 8 questions. Defense counsel asked why Juror No. 8 had not previously informed the court about his relationship with Detective Fritts. Juror No. 8 responded, "I didn't recognize the name. I didn't see him until today and I recognized him. . . . I had no idea." After defense counsel asked Juror No. 8 a few questions, the trial court asked defense counsel if there was "[a]nything else" he wanted to ask, and defense counsel said, "[n]o."

10

The court excused Juror No. 8 from chambers, then defense counsel requested "that he be removed," stating that he did not believe Juror No. 8 was "being truthful. If I had known that his . . . nephew was married to Jimmy Fritts'[s] daughter, I would have exercised a challenge." When the People disagreed, defense counsel argued, "he approached Jimmy Fritts in the hallway this morning and said, 'Hi, Jimmy.' And then he comes in this morning, first question you ask him, 'Do you know Officer Fritts?' and he goes, 'Yes.' ¶ So Jimmy Fritts'[s] name was on the witness list. How can he not recognize Jimmy Fritts'[s] name on the witness list?" The People countered, "I don't believe he is lying or trying to mislead the Court. And certainly he said that he would not take into consideration anything -- they don't even discuss cases. Like he said, he barely knows him."

The trial court denied the request to dismiss Juror No. 8. It noted, "[w]ith regard to the juror's demeanor . . . , it appeared to me he was quite forthright. With that, there was nothing in his demeanor to indicate to the Court that he was being anything but truthful with the Court as to the nature of his relationship and any impact on his having a somewhat passing acquaintance with Detective Fritts. So the Court is going to deny the request that he be replaced."

At defense counsel's request, the trial court then called Juror No. 8 back into chambers and asked that Juror No. 8 not share with other jurors that he was acquainted with Detective Fritts. Juror No. 8 agreed to the court's request.

The People later called Detective Fritts as an expert on narcotics, specifically methamphetamine and cocaine. The defense raised "[n]o objection" to the People's request to qualify Detective Fritts as an expert. Based on evidence presented about the packaging of the narcotics and small bills found in the car defendant was driving prior to her arrest, Detective Fritts opined that the substances were "possessed for intent to sell and distribute."

11

On cross examination, Detective Fritts admitted that it was possible someone might possess the narcotics found in the car for personal use. The People relied on Detective Fritts's testimony in their closing argument to support the argument that defendant possessed the drugs for sale. In its closing, the defense did not mention Detective Fritts. Rather, it focused its argument regarding the possession charges on testimony made by an arresting officer, and it sought to cast doubt on whether defendant was the person who should have been charged with the possession crimes. The defense argued the officer on scene was, "focused on Norma, the person in the front seat, [but] there were other people in the car . . . . He couldn't tell us who was getting out of where, but two guys that were there getting in and out of this car, they are in a high crime drug dealing area and he couldn't tell us what these people were doing . . . because he's focusing on Norma Paisano. I would submit to you, ladies and gentlemen, that these two guys that are in the car that are getting out and interacting with people outside the car are the ones doing any drug dealings if any drug dealing is going on."

B. *Applicable Legal Standards*

A criminal defendant has a constitutional right to trial by an impartial and unbiased jury. (U.S. Const., 6th & 14th Amends.; Cal. Const., art. I, § 16; *In re Hitchings* (1993) 6 Cal.4th 97, 110.) Voir dire of potential jurors plays a critical role in safeguarding this right. (*Hitchings*, at p. 110.) The voir dire process affords a defendant, through his or her counsel or the court, the opportunity to examine prospective jurors to ascertain "possible biases, both known and unknown, on the part of potential jurors." (*Id.* at pp. 110-111 [internal quotations omitted].) Demonstrated bias may result in the dismissal of a juror for cause, and suspicions of bias that do not justify dismissal for cause can still assist parties in determining when to exercise their peremptory challenges. (*Id.* at p. 111.) Thus, when a potential juror conceals relevant facts or gives untrue

12

answers during voir dire, he or she undermines the jury selection process.  (*People v. Wilson* (2008) 44 Cal.4th 758, 823.)

When a trial court is put on notice that good cause might exist to discharge a sworn juror, the court must make whatever inquiry is reasonably necessary to determine if the juror should be discharged.  (*People v. Young* (2017) 17 Cal.App.5th 451, 463 (*Young*).)  When the alleged good cause is that a juror concealed material information during voir dire that may call into question the juror's ability to remain impartial, courts "consider the actual bias test of *People v. Jackson* (1985) 168 Cal.App.3d 700, 705 [214 Cal. Rptr. 346], adopted by [the California Supreme Court] in *People v. McPeters* (1992) 2 Cal.4th 1148, 1175 [9 Cal. Rptr. 2d 834, 832 P.2d 146]."  (*People v. San Nicolas* (2004) 34 Cal.4th 614, 644 (*San Nicolas*).)

As a threshold matter, this test requires a determination as to whether the concealment was intentional.  (See *San Nicolas, supra,* 34 Cal.4th at p. 644.)  This is so because, " '[a]lthough intentional concealment of material information by a potential juror may constitute implied bias justifying his or her disqualification or removal [citations], mere inadvertent or unintentional failures to disclose are not accorded the same effect.' "  (*Id.* at p. 644 [quoting *People v. McPeters*, *supra*, 2 Cal.4th at p. 1175].)  If a court determines that the juror's concealment was unintentional, "the proper test to be applied . . . is whether the juror is sufficiently biased to constitute good cause for the court to find under Penal Code sections 1089 . . . that he is unable to perform his duty."  (*Ibid.*, internal quotations and citations omitted].)  Section 1089 provides that, "If at any time, whether before or after the final submission of the case to the jury, a juror . . . upon . . . good cause shown to the court is found to be unable to perform his or her duty, . . . the court may order the juror to be discharged and draw the name of an alternate."

The determination of whether a juror's failure to disclose information during voir dire was intentional or not is within the discretion of the trial court.  (*San Nicolas*, *supra*, 34 Cal. 4th at p. 644.)  "In evaluating claims of intentional concealment by jurors during

voir dire, '[w]e accept the trial court's credibility determinations and findings on questions of historical fact if supported by substantial evidence.' (*People v. Nesler* (1997) 16 Cal.4th 561, 582 [66 Cal. Rptr. 2d 454, 941 P.2d 87]; see *People v. Majors* (1998) 18 Cal.4th 385, 417 [75 Cal. Rptr. 2d 684, 956 P.2d 1137].)" (*People v. Tuggles* (2009) 179 Cal.App.4th 339, 371-372.) " ' "Before an appellate court will find error in failing to excuse a seated juror, the juror's inability to perform a juror's functions must be shown by the record to be a 'demonstrable reality.' " ' " (*People v. Martinez* (2010) 47 Cal.4th 911, 943, quoting *People v. Jablonski* (2006) 37 Cal.4th 774, 807.)

"Although this court reviews for abuse of discretion a court's ruling discharging a juror pursuant to section 1089 [citation], [our Supreme Court has] made clear that such review involves a 'heightened standard [that] more fully reflects an appellate court's obligation to protect a defendant's fundamental rights to due process and to a fair trial by an unbiased jury.' [Citations] Specifically, the juror's 'inability to perform' his or her duty 'must appear in the record as a demonstrable reality.' [Citations]

"Under the demonstrable reality standard, a reviewing court's task is more 'than simply determining whether any substantial evidence in the record supports the trial court's decision.' [Citation] 'A substantial evidence inquiry examines the record in the light most favorable to the judgment and upholds it if the record contains reasonable, credible evidence of solid value upon which a reasonable trier of fact *could* have relied in reaching the conclusion in question. Once such evidence is found, the substantial evidence test is satisfied. . . . [¶] The demonstrable reality test entails a more comprehensive and less deferential review. It requires *a showing that the court as trier of fact did rely on evidence that, in light of the entire record, supports its conclusion that [good cause for removing the juror is] established*. It is important to make clear that a reviewing court does not *reweigh* the evidence under either test. Under the demonstrable reality standard, however, the reviewing court must be confident that the trial court's conclusion is manifestly supported by evidence on which the court actually relied. [¶] In

14

reaching that conclusion, the reviewing panel will consider not just the evidence itself, but also the record of reasons the court provides.' " (*People v. Armstrong* (2016) 1 Cal.5th 432, 450-451, italics original and added.)

   C. *The Trial Court Did Not Abuse Its Discretion in Keeping Juror No. 8*

   The trial court acted within its discretion in declining to dismiss Juror No. 8.

   First, the trial court conducted an inquiry that was "reasonably necessary" to determine if the juror should be discharged. (See *Young*, *supra*, 17 Cal.App.5th at p. 463.) When it was brought to the trial court's attention that a juror had approached Detective Fritts, the court heard from Detective Fritts regarding how he was acquainted with the juror, and then it interviewed the juror. The court probed Juror No. 8 regarding how much he knew about Detective Fritts's job and his own ability to remain impartial in light of the acquaintance. The court also let the defense question Juror No. 8 regarding his relationship with Detective Fritts until defense counsel had no further questions. In short, the trial court made a focused and fair inquiry regarding the issues it was necessary to explore to ascertain the potential level of Juror No. 8's bias.

   Next, it was well within the trial court's discretion, in light of the information provided by Juror No. 8 and Detective Fritts, to determine that Juror No. 8's nondisclosure of his acquaintance with Detective Fritts was unintentional. (See *San Nicolas*, *supra*, 34 Cal. 4th at p. 644.) Both Detective Fritts and Juror No. 8 described their contact as infrequent, with Detective Fritts using the word "occasionally" and Juror No. 8 referring to it as "maybe once a year." Detective Fritts's account and Juror No. 8's account of how they were connected to each other differed but were not per se inconsistent. Detective Fritts did not know Juror No. 8's name, and he incorrectly guessed when he tried to guess Juror No. 8's last name. Moreover, when the court asked Juror No. 8 if he ever spoke with Detective Fritts about his work, he responded that he barely even knows him. Finally, when asked why he did not tell the court about his

15

relationship with Detective Fritts earlier, the juror indicated he had not recognized the name. Based on the above, the trial court acted within its discretion to determine that Juror No. 8's failure to disclose his acquaintance with Detective Fritts was unintentional. It is completely plausible that prior to the trial Juror No. 8 was unaware of the nature of Detective Fritts's work or that Detective Fritts's name did not register with the juror when he saw a Detective "Fritz" listed as one of many potential witnesses.

Finally, the trial court acted within its discretion in determining that there was not good cause to excuse Juror No. 8 once his acquaintance with Detective Fritts was revealed. The trial court considered Juror No. 8's demeanor when it questioned him, and felt he was "quite forthright" and there was nothing to "indicate . . . that he was being anything but truthful . . . as to the nature of his relationship and any impact on his having a somewhat passing acquaintance with Detective Fritts." There was no demonstration that Juror No. 8 would be biased, and the trial court's determination must be upheld. (See *People v. Holt* (1997) 15 Cal.4th 619, 659.)

Defendant tries to cast doubt on the trial court's conclusion by suggesting that Juror No, 8 was not, in fact, forthright and truthful about his relationship with Detective Fritts. Defendant observes that Juror No. 8's indication that he did not recognize Detective Fritts's name during voir dire is undermined by when he responded "yes" when asked if he knew Detective Fritts. Defendant also argues that Juror No. 8 misstated the frequency of his contacts with Detective Fritts as "maybe once a year" when he then listed "Thanksgiving, Christmas, family get-togethers" as the times when they might meet, which are events that together occur more than once a year. Moreover, defendant argues, this list fails to include the one hunting trip the two went on together, and Juror No. 8 failed to mention the relationship between his granddaughter and Detective Fritts's daughter when asked how the two knew each other.

This line of argument is misplaced. To begin with, all of these discrepancies suggest, as much as anything, that the relationship Juror No. 8 has with Detective Fritts is

16

not particularly significant to Juror No. 8: (1) The Jimmy he knows did not come to mind when he saw a Detective Fritz listed on the witness list, and, (2) how their two lives have intersected is not at the forefront of Juror No. 8's mind. He could have been able to answer that, yes, he knows "Detective Fritts" because he had just seen him--a person he had crossed paths with and knew as Jim or Jimmy--in the hall before the court brought him in to question him. Finally, as transcribed, the exact meaning of Juror No. 8's testimony regarding how often he saw Detective Fritts does not lead to the inevitable conclusion that the two saw each other more than once a year. It is possible that the listed events were examples of the times Juror No. 8 might see Detective Fritts, and that, on average, they crossed paths at one such event each year and that Juror No. 8 did not mean, when he provided the list, that he always saw Detective Fritts at each of those events.

The record does not support a finding that Juror No. 8 had an inability to perform his duties as a juror as a demonstrable reality and the trial court did not err in allowing him to remain on the jury.

II

*There is Sufficient Evidence to Support All of the Jury's Findings at Issue*

Defendant raises three arguments that challenge the sufficiency of evidence in support of her attempted murder convictions and a related enhancement. First, she argues we must overturn all three attempted murder convictions because there is insufficient evidence that she intended to kill Herron, White, and Jones, and that, instead, the only reason they were shot was their proximity to the intended victim. Second, with respect to White, she argues that there was insufficient evidence to establish that White suffered a gunshot wound or that defendant shot a gun at him. Finally, she argues that there was

17

insufficient evidence to support the firearm enhancement that Herron suffered great bodily injury as a result of her gunshot wounds.  We disagree with all three arguments.

A.      *We Review Claims of a Lack of Sufficient Evidence Under the Substantial Evidence Standard*

This court's role in reviewing a challenge to the sufficiency of evidence is limited. (*People v. Smith* (2005) 37 Cal.4th 733, 738 (*Smith*).)  "To assess the evidence's sufficiency, we review the whole record to determine whether *any* rational trier of fact could have found the essential elements of the crime or special circumstances beyond a reasonable doubt.  [Citation.]  The record must disclose substantial evidence to support the verdict—i.e., evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.]"  (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)  In so doing, "we must view the evidence in the light most favorable to the People and must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.  [Citation.]"  (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.)  This is so, because "it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends." (*Ibid.*)  As such, "[c]onflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment."  (*People v. Maury* (2003) 30 Cal.4th 342, 403.) And, "[a] reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the jury's verdict.  (*People v. Bolin* (1998) 18 Cal.4th 297, 331 [75 Cal. Rptr. 2d 412, 956 P.2d 374].)"  (*Zamudio*, *supra*, 43 Cal.4th at p. 357.)

B.      *There is Sufficient Evidence that Defendant Had the Requisite Intent to Kill*

Though a murder conviction does not require an intent to kill, an attempted murder conviction requires both the specific intent to kill and the commission of a direct but

ineffectual act towards carrying out the intended killing. (*Smith*, *supra*, 37 Cal.4th at p. 739.) Thus, in order for a defendant to be convicted of the attempted murder of a victim, the prosecution must prove the defendant acted with the specific intent to kill the victim. (*Ibid.*) Moreover, "[t]o be guilty of attempted murder, the defendant must intend to kill the alleged victim, not someone else." (*People v. Bland* (2002) 28 Cal.4th 313, 328.) Yet, "[o]ne who intentionally attempts to kill another does not often declare his state of mind either before, at, or after the moment he shoots. Absent such direct evidence, the intent obviously must be derived from all the circumstances of the attempt, including the putative killer's actions and words. Whether a defendant possessed the requisite intent to kill is, of course, a question for the trier of fact. While reasonable minds may differ on the resolution of that issue, our sole function is to determine if *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (*People v. Lashley* (1991) 1 Cal.App.4th 938, 945-946; see also, *Smith*, at p. 739.) "[T]he act of purposefully firing a lethal weapon at another human being at close range, without legal excuse, generally gives rise to an inference that the shooter acted with express malice." (*Smith*, p. 742.) Moreover, "even if the shooting was not premeditated, with the shooter merely perceiving the victim as 'a momentary obstacle or annoyance,' the shooter's purposeful 'use of a lethal weapon with lethal force' against the victim, if otherwise legally unexcused, will itself give rise to an inference of intent to kill. (*People v. Arias* [(1996)] 13 Cal.4th [92,] 162.)" (*Smith*, at p. 742.)

Using these principles, the Court of Appeal and our Supreme Court have upheld attempted murder convictions where the victims were sitting in the line of fire of a bullet shot into a moving car, (*Smith*, *supra*, 37 Cal.4th at p. 744 [upholding attempted murder convictions of a defendant who fired a single shot at a car in a line that came close to hitting both a mother and her baby]; *People v. Leon* (2010) 181 Cal.App.4th 452, 465 [upholding an attempted murder conviction as to one passenger sitting in the line of fire of a single shot that killed another passenger, but overturning the conviction as to the

passenger not in the line of fire]), and of two police officers "[w]here a defendant fires at two officers, one of whom is crouched in front of the other, [endangering] the lives of both officers . . . ." (*People v. Chinchilla* (1997) 52 Cal.App.4th 683, 691.)

Here, the defendant fired her gun multiple times into a group of people, then followed the group, continuing to shoot, as it fled from her. Even if she appeared to be primarily focused on one specific person at some point during the shooting, that does not change the fact that the entirety of her actions show she purposely fired a gun into (i.e., used lethal force against) a group of people multiple times, killing one and injuring three others. At a minimum, the evidence could lead a reasonable person to conclude beyond a reasonable doubt that defendant saw the attempted murder victims as momentary obstacles or annoyances that she needed to get out of the way--killing them if need be--in order to reach her preferred target. Moreover, the evidence suggests that she did not limit the number of shots fired to what she believed would be necessary to kill one person, but that she only stopped shooting when she ran out of bullets. It may be that a desire to kill the three attempted murder victims did not prompt defendant to go to a busy intersection and open fire that day, but the evidence strongly suggests the victims were at least "a momentary obstacle or annoyance" that she was willing to take out with lethal force. As such, sufficient evidence supports the attempted murder convictions.

C. *Sufficient Evidence Supports That Defendant's Actions Caused White's Injuries*

A reasonable trier of fact could find beyond a reasonable doubt that defendant shot at White and caused his injury. Griffin indicated that a black man had been shot in the thigh. When investigating the shooting at the scene, Officer Talamontes, who has seen many gunshot injuries throughout his career, saw a wound consistent with a gunshot wound on White's inner right thigh, and he identified White as a black man. White's wounds were consistent with those of a shooting victim described by Griffin, and no

other identified victim had injuries on their inner thigh.  It was reasonable for the jury to find White's wounds were the result of defendant's actions.

D.    *Sufficient Evidence Supports That Herron Suffered Great Bodily Injury*

The jury found true the section 12022.53, subdivision (d), firearm enhancement to defendant's conviction for the attempted murder of Herron.  According to section 12022.53, subdivision (d):  "Notwithstanding any other provision of law, any person who, in the commission of a [specified] felony . . . , personally and intentionally discharges a firearm and proximately causes great bodily injury, as defined in Section 12022.7, . . . to any person other than an accomplice, shall be punished by an additional and consecutive term of imprisonment in the state prison for 25 years to life."

Defendant argues that there was insufficient evidence for the jury to find Herron suffered great bodily injury.

Section 12022.7, subdivision (f) defines "great bodily injury" as "a significant or substantial physical injury."  A " 'significant or substantial physical injury' need not meet any particular standard for severity or duration, but need only be 'a substantial injury beyond that inherent in the offense itself[.]' ([*People v. Escobar* (1992) 3 Cal.4th 740 (*Escobar*),] 746–747 [disapproving *People v. Caudillo* (1978) 21 Cal.3d 562 [146 Cal. Rptr. 859, 580 P.2d 274] on this point].)"  (*People v. Le* (2006) 137 Cal.App.4th 54, 58-59.)  There is "no specific requirement that the victim suffer 'permanent,' 'prolonged' or 'protracted' disfigurement, impairment, or loss of bodily function," before a jury may conclude an injury is a great bodily injury.  (*Escobar* (1992) 3 Cal.4th 740, 750.)

Whether a victim's injury amounts "to great bodily injury is not a question of law for the court but a factual inquiry to be resolved by the jury.  (*Escobar*, *supra*, 3 Cal.4th at p. 750; *People v. Wolcott* (1983) 34 Cal.3d 92, 109 [192 Cal. Rptr. 748, 665 P.2d 520].)  ' "A fine line can divide an injury from being significant or substantial from an injury that does not quite meet the description." ' (*Escobar*, *supra*, 3 Cal.4th at p. 752,

21

quoting *People v. Jaramillo* (1979) 98 Cal.App.3d 830, 836 [159 Cal. Rptr. 771]; *People v. Clay* (1984) 153 Cal.App.3d 433, 460 [200 Cal. Rptr. 269].) Where to draw that line is for the jury to decide." (*People v. Cross* (2008) 45 Cal.4th 58, 64) "If there is sufficient evidence to sustain the jury's finding of great bodily injury, we are bound to accept it, even though the circumstances might reasonably be reconciled with a contrary finding." (*People v. Salas* (1978) 77 Cal.App.3d 600, 606; see also *Escobar*, *supra*, 3 Cal.4th at p. 750.)

The facts regarding the nature of the injury at issue in *People v. Lopez* (1986) 176 Cal.App.3d 460 are similar to the facts here. One victim was shot "in the right cheek of the hip" and heard a ringing in his ear and fell to the ground screaming, but felt no pain because he was dazed. (*Id.* at p. 462.) The other victim was shot in the left leg, with the bullet penetrating and exiting the victim's leg. (*Ibid.*) While she felt "fire" in her leg, she was able to drag the other victim to safety after she was shot. (*Ibid.*) No bullets remained in either victim's body. (*Id.* at p. 465.) The First District Court of Appeal upheld the trial court's findings that the victims had suffered great bodily injury. (*Ibid.*)

Here, there was substantial evidence to support the jury's finding that Herron suffered great bodily injury as a result of the attempted murder.

It is true that the bullet that stuck Herron did not impact any of her vital organs or remain in her body after the shooting, and her treatment did not require stitches, surgery, or sutures. However, upon admission to the emergency room, staff classified her in the highest injury category, and her pain level was severe enough that she was crying and labeled it a 10 out of 10. Though Herron left the hospital after doctors treated her wounds, hospital staff believed her injuries warranted admitting her to the hospital and she signed out against medical advice. Finally, two years after the shooting, Herron still had three scars as a result of her injury that were bigger than an inch. Taken together, these facts, much like the facts in *People v. Lopez, supra,* 176 Cal.App.3d at page 465,

are sufficient to support the jury's finding that Herron suffered a great physical injury as a result of the shooting.

## III

*The Trial Court Did Not Abuse Its Discretion in Declining to Dismiss Defendant's Prior Felony Conviction, Resulting in the Imposition of a Second Strike*

Defendant argues the trial court abused its discretion when it refused to strike her prior serious felony within the meaning of section 1385.

A. *Additional Background and Summary of Defendant's Argument on Appeal*

The defendant argued at the sentencing hearing that unless the trial court struck her prior strike, her sentence would be tantamount to cruel and unusual punishment as contemplated by the Eight Amendment of the United States Constitution and article one, section 17 of the California Constitution. The defense also took the position that the prior offense should be stricken because defendant falls outside the spirit of the Three Strikes Law. The defense argued the punishment was unconstitutional and not within the spirit of the Three Strikes Law given (1) defendant's relatively young age at the time she committed the prior offense and the shooting--17, respectively; (2) the conditions in which she was raised; (3) the 194-year mandatory sentence in this case; and (4) the fact that the burglary was not a violent felony.

The trial court disagreed with defendant's characterization of the facts and denied the request. In so doing, the trial court noted that "defendant has exhibited no remorse, certainly." The trial court also observed that "the nature and circumstances of the present felonies . . . were highly vicious and violent in a callous disregard for the people on the street in the area," and "indicate a level of planning and sophistication that speak to defendant being highly dangerous to society." The trial court also noted that the prior felony, "was a burglary in the first degree, to someone's home, certainly well qualified as a serious felony and dangerous in its own right as a result." Finally, the trial court

23

considered "defendant's prospects" and noted "defendant has had other contacts with the criminal justice system. Being on her own recognizance release in a felony case pending in this county when the murder and attempted murders occurred. She was a parolee at large. She was in contact with that system after being released from state prison, showing a complete lack of respect for and compliance with the rules of her release and the rules of her parole."

The trial court also disagreed with defendant's characterization of her upbringing, noting that her family life was not "a horrific crime producing setting," and that her continued involvement in the "family activity," of drug trafficking at the time of her arrest did "not speak highly of her prospects." Having considered these and other factors, the trial court concluded, "defendant does not fall outside the spirit of the Three Strikes legislation."

Having found that at the time she committed the crimes at issue in this action, defendant had a prior conviction for a serious felony as defined in section 667, subdivision (d), and section 1170.12, subdivision (b), pursuant to the requirements of section 667, subdivision (e)(1) the trial court imposed "twice the term otherwise provided as punishment" of the "determinate term or minimum term for an indeterminate term" as punishment for each felony conviction in this case. (See also § 1170.12, subd. (c)(1).)

Here, defendant reiterates the two arguments she made at the trial court. First, she argues that when the trial court declined the opportunity to exercise its section 1385 discretion to dismiss the prior strike, and therefore punished her applying the Three Strikes Law, it denied her the opportunity for a youthful offender parole hearing, functionally consigning her to a life in prison without the possibility of parole. Defendant maintains that, in light of defendant's relative youth when the prior burglary and the instant crimes were committed, this punishment is cruel and unusual in violation of U.S. and California Constitutions' prohibitions on cruel and unusual punishment. Second, defendant maintains the trial court abused its discretion because applying the

24

Three Strikes Law in this instance is outside of the spirit of the Three Strikes Law. Neither argument is persuasive.

B. *We Review Section 1385 Rulings for an Abuse of Discretion*

Section 1385, subdivision (a), allows a judge to, "either of his or her own motion or upon the application of the prosecuting attorney, and in furtherance of justice, order an action to be dismissed." Our Supreme Court has held that this "power to dismiss an action includes the lesser power to strike factual allegations relevant to sentencing, such as the allegation that a defendant has prior felony convictions." (*Romero*, *supra*, 13 Cal.4th at p. 504.) This includes the power to dismiss prior felony conviction allegations that arise under the Three Strikes Law contained in section 667, subdivisions (b) through (i). (*Ibid.*) "[A] court's failure to dismiss or strike a prior conviction allegation is subject to review under the deferential abuse of discretion standard." (*People v. Carmony* (2004) 33 Cal.4th 367, 374.) When a court exercises its discretion under section 1385, it must balance both the constitutional rights of the defendant and the interests of society represented by the People. (*Romero*, at p. 530.)

C. *Defendant's Sentence is Not Cruel and Unusual*

Some additional legal context helps clarify defendant's argument that the trial court's failure to strike the prior serious felony effectively resulted in a cruel and unusual punishment.

Under section 3051, when a person aged 25 or younger is convicted of a crime or multiple crimes and sentenced to prison, if the longest punishment imposed for the crimes for which the person is convicted is 25 years to life, that person becomes "eligible for release on parole at a youth offender parole hearing during the person's 25th year of incarceration." (See § 3051, subds. (a) & (b)(3).) However, section 3051 does not apply to a defendant who a court sentences under section 667. (*Id.* at subd. (h).) Thus, because the trial court denied defendant's request to strike the prior serious felony and calculated

25

defendant's base sentence using section 667, in addition to adding 50 years and four months to her overall sentence, the trial court eliminated her eligibility for a youth offender parole hearing during her 25th year of incarceration.  As a result, and viewed in conjunction with her 205-year and eight-month sentence, defendant is unlikely to ever get out of prison.

The U.S. and California Constitutions' bans on cruel and unusual punishment prohibit sentences that are disproportionate to the crime committed.  (*Ewing v. California* (2003) 538 U.S. 11, 22; see *In re Butler* (2018) 4 Cal.5th 728, 744.)  Cases in which punishments are found to be cruel and unusual are rare.  (See, e.g., *People v. Weddle* (1991) 1 Cal.App.4th 1190, 1195 ["[W]e do not find this to be one of the rare cases where the sentence was 'grossly disproportionate' to the crime"].)  Here, the trial court aptly noted that "the nature and circumstances of the present felonies . . . were highly vicious and violent in a callous disregard for the people on the street in the area," and "indicate a level of planning and sophistication that speak to defendant being highly dangerous to society."  Indeed, defendant went to a crowded intersection where a group was distributing needed items for the homeless, fired her gun into a group of people until she ran out of bullets, and killed one man and attempted to murder three others causing them injury.  Under these facts, the punishment is not disproportionate to the crimes.

Likely recognizing that the nature of her crimes, in and of themselves, do not warrant a finding that the punishment here is disproportionate to the crime, defendant cites various cases applicable to youthful offenders and suggests the protections afforded to minors by those cases should be extended to her.  But the cases defendant relies on are inapposite.

In *Miller v. Alabama* (2012) 567 U.S. 460, 465, the U.S. Supreme Court determined that "mandatory life without parole for those under the age of 18 at the time of their crimes violates the Eighth Amendment's prohibition on 'cruel and unusual punishments.' "  Likewise, in *Roper v. Simmons* (2005) 543 U.S. 551, 578-579, the U.S.

26

Supreme Court was specifically concerned with punishments applied to persons under the age of 18, when it found, "[t]he Eighth and Fourteenth Amendments forbid imposition of the death penalty on offenders who were under the age of 18 when their crimes were committed." Though she may have been 17 at the time of the burglary--which was her *prior* strike--defendant was 20 when she committed the crimes adjudicated and punished in this case. The defendant in *People v. Franklin* (2016) 63 Cal.4th 261, 268 was 16 years old at the time he committed the crime at issue in that case, and our Supreme Court specifically indicated that in light of its other findings, "we need not decide whether a life sentence with parole eligibility after 50 years of incarceration is the functional equivalent of an LWOP sentence and, if so, whether it is unconstitutional in Franklin's case." Defendant cannot cloak herself in the protections applicable to legal minors referenced in these decisions. The sentence here is not cruel and unusual.

D. *Defendant Falls Within the Spirit of the Three Strikes Law*

Defendant argues that the trial court abused its discretion when it denied her request to dismiss her prior felony because "her case is outside the spirit of Three Strikes." Here we are guided by the California Supreme Court's holding and reasoning in *People v. Carmony, supra,* 33 Cal.4th at pages 377-378:

"Because 'all discretionary authority is contextual' [citation], we cannot determine whether a trial court has acted irrationally or arbitrarily in refusing to strike a prior conviction allegation without considering the legal principles and policies that should have guided the court's actions. We therefore begin by examining the three strikes law.

" '[T]he Three Strikes initiative, as well as the legislative act embodying its terms, was intended to restrict courts' discretion in sentencing repeat offenders.' (*Romero*, *supra*, 13 Cal.4th at p. 528 [53 Cal.Rptr.2d 789, 917 P.2d 628].) To achieve this end, 'the Three Strikes law does not offer a discretionary sentencing choice, as do other sentencing laws, but establishes a sentencing requirement to be applied in every case where the

27

defendant has at least one qualifying strike, unless the sentencing court "conclud[es] that an exception to the scheme should be made because, for articulable reasons which can withstand scrutiny for abuse, this defendant should be treated as though he actually fell outside the Three Strikes scheme." ' ([*People v. ]Strong[* (2001)] 87 Cal.App.4th [328] 337–338, fn. omitted.)

"Consistent with the language of and the legislative intent behind the three strikes law, we have established stringent standards that sentencing courts must follow in order to find such an exception. '[I]n ruling whether to strike or vacate a prior serious and/or violent felony conviction allegation or finding under the Three Strikes law, on its own motion, "in furtherance of justice" pursuant to Penal Code section 1385(a), or in reviewing such a ruling, the court in question must consider whether, in light of the nature and circumstances of his present felonies and prior serious and/or violent felony convictions, and the particulars of his background, character, and prospects, the defendant may be deemed outside the scheme's spirit, in whole or in part, and hence should be treated as though he had not previously been convicted of one or more serious and/or violent felonies.' ([*People v. ]Williams[* (1998)] 17 Cal.4th [148,] 161.)

"Thus, the three strikes law not only establishes a sentencing norm, it carefully circumscribes the trial court's power to depart from this norm and requires the court to explicitly justify its decision to do so. In doing so, the law creates a strong presumption that any sentence that conforms to these sentencing norms is both rational and proper."

As a result, when we consider a trial court's decision that the court will not dismiss a prior serious felony using its discretion under section 1385, " '[i]t is not enough to show that reasonable people might disagree about whether to strike one or more' prior conviction allegations. [Citation.]" (*Id.* at p. 378.) "Where the record demonstrates that the trial court balanced the relevant facts and reached an impartial decision in conformity with the spirit of the law, we shall affirm the trial court's ruling, even if we might have ruled differently in the first instance. (*People v. Wade* (1959) 53 Cal.2d 322, 338 [1 Cal.

Rptr. 683, 348 P.2d 116].)" (*People v. Myers* (1999) 69 Cal.App.4th 305, 310.) The circumstances "where no reasonable people could disagree that the criminal falls outside the spirit of the three strikes scheme" must be particularly "extraordinary." (*People v. Carmony*, *supra*, 33 Cal.4th at p. 378; see also *Strong, supra,* 87 Cal.App.4th at p. 332.)

"The well-recognized purpose of the three strikes law is to provide increased punishment for current offenders who have previously committed violent or serious crimes and have therefore not been rehabilitated or deterred from further criminal activity as a result of their prior imprisonment. (*People v. Davis* (1997) 15 Cal. 4th 1096, 1099 [64 Cal. Rptr. 2d 879, 938 P.2d 938].)" (*People v. Leng* (1999) 71 Cal.App.4th 1, 14; see also *People v. Superior Court* (*Perez*) (1995) 38 Cal.App.4th 347, 357-358 [purpose of the Three Strikes law is to ensure " 'longer prison sentences and greater punishment' for serious recidivists, i.e., those felony defendants who have previously been convicted of serious and/or violent crimes"].)

The trial court did not abuse its discretion when it rejected defendant's arguments that she fell outside the spirit of the Three Strikes Law. On the contrary, it correctly considered that defendant's prior strike--a home burglary--had been "dangerous in its own right." It also correctly noted that "defendant has had other contacts with the criminal justice system," including having the status of a "parolee at large" at the time of the shooting, and that at the time of sentencing she still "exhibited no remorse." Here "the record demonstrates that the trial court balanced the relevant facts and reached an impartial decision in conformity with the spirit of the law." (*People v. Myers, supra,* 69 Cal.App.4th at p. 310.) As such "we shall affirm the trial court's ruling" to not strike the prior serious felony. (*Ibid.*)

*There is No Need to Remand the Case for the Trial Court to Exercise Its Discretion*

*Under Post-Judgment Amendments to Sentencing Statutes*

Defendant argues that this court must remand this case to allow the trial court to use its discretion to strike or not strike the section 12022.53 firearm sentencing enhancements imposed on the murder and attempted murder convictions, because the law imposing those enhancements was amended after judgment was entered in this case to allow trial courts to exercise such discretion, and the amended law applies retroactively to the sentence imposed in this case. These sentence enhancements--three 25-year terms under subdivision (d) and one 20-year term under subdivision (c)--account for 95 years of defendant's sentence. Similarly, in supplemental briefing, defendant argues that we should remand this case so that the trial court can consider striking the five-year enhancement imposed on her murder conviction due the court's finding that she committed a prior serious felony within the meaning of section 667, subdivision (a), because section 667 was amended to give trial courts discretion to strike prior-serious-felony findings after the judgment was entered in this case.

The People agree that the amended statutes apply retroactively in this case but contend that remand in not necessary because the record clearly indicates that the trial court would not exercise its discretion to strike the enhancements if given the opportunity. We agree with the People.

Section III, A. contains a summary of the trial court's relevant statements during sentencing.

A. *The Amended Statutes Apply Retroactively*

Section 12022.53, subdivision (c), provides that "any person who, in the commission of [attempted murder], personally and intentionally discharges a firearm, shall be punished by an additional and consecutive term of imprisonment in the state

prison for 20 years." Likewise, subdivision (d), adds a 25-year consecutive prison term to the sentence of any person who during the commission of a murder or attempted murder, "personally and intentionally discharges a firearm and proximately causes great bodily injury, as defined in Section 12022.7, or death, to any person other than an accomplice." When the trial court entered judgment in this matter it had no discretion to strike a section 12022.53 firearm enhancement. (See § 12022.53, subd. (h) (2010) ["Notwithstanding Section 1385 or any other provision of law, the court shall not strike an allegation under this section or a finding bringing a person within the provisions of this section"].) After the trial court sentenced defendant, the Legislature amended section 12022.53, subdivision (h), to allow a trial court to, "in the interest of justice pursuant to Section 1385 and at the time of sentencing, strike or dismiss an enhancement" that section 12022.53 required. (§ 12022.53, subd. (h); see also Stats. 2017, ch. 682, § 2.) The authority to strike or dismiss a finding that a person used a firearm in the commission of an offense extends to "any resentencing that may occur pursuant to any other law." (*Ibid.*)

Similar amendments were made to section 667 after judgment was entered in this matter, which, in subdivision (a)(1), adds a five-year sentencing enhancement to the sentence for a serious felony when the defendant, "previously has been convicted of a serious felony in this state." "Prior to 2019, trial courts had no authority to strike a serious felony prior that is used to impose a five-year enhancement under section 667, subdivision (a)(1). Senate Bill 1393 removed this prohibition. (Stats. 2018, ch. 1013, §§ 1, 2.) The legislation became effective January 1, 2019. (Cal. Const., art. IV, § 8, subd. (c).)" (*People v. Jones* (2019) 32 Cal.App.5th 267, 272 (*Jones*).)

As articulated by our Supreme Court in *In re Estrada* (1965) 63 Cal.2d 740, 742, when a statute is amended that mitigates a punishment after the prohibited act is committed but before final judgment, the "punishment provided by the amendatory act should be imposed." In *People v. Francis* (1969) 71 Cal.2d 66, 76, our Supreme Court

31

applied *Estrada* to circumstances in which "the amendment does not revoke one penalty and provide for a lesser one but rather vests in the trial court discretion to impose either the same penalty as under the former law or a lesser penalty." In *Francis*, our Supreme Court also clarified that an amended penalty statute applies in instances in which the amendment occurred after sentencing in the trial court but before the case was resolved on appeal. (*Id.* at p. 77.)

Here, the amendment to subdivision (h) of section 12022.53 "necessarily reflects a legislative determination that the previous bar on striking firearm enhancements was too severe, and that trial courts should instead have the power to strike those enhancements in the interest of justice." (*People v. Woods* (2018) 19 Cal.App.5th 1080, 1091.) Additionally, "because there is nothing in the amendment to suggest any legislative intent that the amendment would apply prospectively only, we must presume that the Legislature intended the amendment to apply to every case to which it constitutionally could apply, which includes this case." (*Ibid.*) Likewise, when the Legislature "enacted Senate Bill 1393," amending section 667, subdivision (a)(1), "the Legislature did not indicate it intended the legislation to apply prospectively only. (*Estrada*, [*supra*, 63 Cal.2d] at p. 742; *[People v.] Garcia* [(2018) 28 Cal.App.5th 961,] 972.) The act thus applies retroactively to this case." (*Jones*, *supra*, 32 Cal.App.5th at p. 272.)

B. *We Need Not Remand, Because the Record Clearly Indicates the Trial Court Would Not Have Stricken the Enhancements*

A finding that amended sentencing provisions apply retroactively, "is not the end of the matter. We are not required to remand to allow the court to exercise its discretion if 'the record shows that the trial court clearly indicated when it originally sentenced the defendant that it would not in any event have stricken [the] . . . enhancement' even if it had the discretion. (*People v. McDaniels* (2018) 22 Cal.App.5th 420, 425 [231 Cal. Rptr. 3d 443].)" (*Jones*, *supra*, 32 Cal.App.5th at pp. 272-273.) In taking into account the trial

court record, "[t]he trial court need not have specifically stated at sentencing it would not strike the enhancement if it had the discretion to do so. Rather, we review the trial court's statements and sentencing decisions to infer what its intent would have been." (*Id.* at p. 273.)

Here, the trial court's statements when considering the request to strike the prior serious felony make it clear it would not have stricken the firearm enhancements or the section 667, subdivision (a)(1), enhancement had it been given the opportunity. The trial court, (1) observed defendants lack of remorse; (2) referred to the crimes as "highly vicious and violent in a callous disregard for the people on the street in the area"; (3) stated that the "planning and sophistication" involved in the shooting suggested that defendant is "highly dangerous to society"; and (4) noted the defendant--as a parolee at large after her release from prison for the burglary--had shown "a complete lack of respect for and compliance with the rules of her release and the rules of her parole." Based on this record, remanding this matter to allow the trial court to exercise its discretion under the amended versions of sections 12022.53 and 667 would be a waste of judicial and other resources.

V

*The Two-Year Sentence Imposed for the Section 12022.1 Enhancement Must Be Stayed*

Defendant argues that the two-year on-bail sentencing enhancement imposed on the murder conviction must be stayed pursuant to section 12022.1, subdivision (d), because the trial court did not make a finding that she was convicted for the alleged offense for which she was released on-bail at the time of the offenses that gave rise to this case. Respondent agrees. We also agree.

Section 12022.1, subdivision (b) provides that, "[a]ny person arrested for a secondary offense that was alleged to have been committed while that person was released from custody on a primary offense shall be subject to a penalty enhancement of

an additional two years, which shall be served consecutive to any other term imposed by the court." A "primary offense" is a felony offense "for which a person has been released from custody on bail or on his or her own recognizance prior to the judgment becoming final." (§ 12022.1, subd. (a)(1).) A "secondary offense" is a felony offense the person is "alleged to have been committed while . . . released from custody for a primary offense." (*Id.* at subd. (a)(2).) When a person is convicted of a secondary offense before the primary offense, "the imposition of the enhancement shall be stayed pending imposition of the sentence for the primary offense. . . . If the person is acquitted of the primary offense the stay shall be permanent." (*Id.* at subd. (d).)

At sentencing when the trial court made its findings regarding defendant's prior felony convictions and alleged on-bail enhancements, the People sought judicial notice of the fact that in January 2015, defendant had been arraigned on felony charges in San Joaquin County Superior Court Case No. MF038913 and released on her own recognizance. She then failed to appear for a February court date, at which time the judge in that case revoked the own recognizance order and issued a bench warrant for $30,000. The warrant remained outstanding until defendant's arrest in this case. The trial court in this case found true beyond a reasonable doubt that defendant had been released on her promise to appear in "case MF38913 . . . and maintained that status on the date and up until July 27th, 2015, and including the date of [the shooting]."

At the sentencing hearing, after imposing sentences in this case, the trial court dismissed MF038913, but made no mention of permanently staying the two-year on-bail enhancement it had imposed while using the crimes alleged in that action as the primary offense. Likewise, the abstract of judgment does not indicate that the two-year on-bail enhancement was stayed as a result of lack of a conviction on the primary offense. Because on this record it does not appear defendant was ever convicted of the primary offense upon which the on-bail enhancement was based, the two-year sentence imposed

34

for that enhancement should have been stayed pursuant to section 12022.1, subdivision (d).

## VI

### *The Trial Court Erred in Not Awarding Presentence Custody Credits*

Defendant argues that the trial court erred in failing to award her presentence custody credits for time served between the date of her arrest and the date the trial court sentenced her. In its brief, the People argue that the trial court did not err when it failed to award any presentence custody credits, because defendant was not entitled to conduct credit as a result of her first-degree murder conviction. In her reply, defendant argues that the People's argument is misplaced--and the trial court erred--in failing to distinguish between *conduct* credits, which cannot be awarded to persons convicted of first-degree murder and *custody* credits, which can be awarded. We agree with defendant.

### A. *Custody Credit Facts*

Police took defendant into custody on July 27, 2015. The trial court sentenced her on July 7, 2017. At the sentencing hearing, the clerk inquired about awarding the defendant credit for time served between her arrest and conviction. The People stated, "[p]ursuant to Penal Code section 2933.2[, subdivisions ](a) and (c), the defendant is not entitled to any prison conduct credits, nor is she eligible to receive any conduct credit for local custody time due to being convicted of the first-degree murder in Count 1." Defense counsel offered no comment, and the trial court decreed, "[n]o credits for time served." Likewise, the abstract of judgment reflects no credits for time served.

### B. *Defendant is Entitled to Presentence Custody Credits*

When a person convicted of a crime has spent time in custody between the date of her arrest and the date the court sentences her, the court can award various credits based on time served presentence and the defendant's behavior and actions while in custody

35

pending conviction. Section 2900.5 provides that, "[i]n all felony . . . convictions, . . . when the defendant has been in custody, . . . all days of custody of the defendant . . . shall be credited upon his or her term of imprisonment." Other provisions of the Penal Code allow the court to award presentence custody credits for good conduct and/or participation in certain rehabilitation or work programs. (See, e.g., §§ 2933.05, 4019.)

Not all defendants are eligible to receive all types of presentence credits. Section 2933.2, prohibits a court from awarding conduct, program participation, or specified work program credits to persons convicted of first-degree murder. However, section 2933.2's prohibition does not apply to custody credits under section 2900.5, and, in fact, a defendant convicted of first-degree murder remains entitled to presentence custody credits. (*People v. Taylor* (2004) 119 Cal.App.4th 628, 646 (*Taylor*).) As such, the trial court erred in not awarding defendant any presentence custody credits.

A sentence that fails to award legally mandated custody credit is unauthorized and may be corrected whenever discovered. (*Taylor*, *supra*, 119 Cal.App.4th at p. 646.) We will award defendant 711 days of presentence custody credit and direct the trial court to prepare a corrected abstract of judgment.

DISPOSITION

We affirm the judgment except to amend the sentence and abstract of judgment to stay the section 12022.1 on-bail enhancement and give defendant pre-sentence custody credits for time served.

                                                      _____

                                                      HULL, J.

I concur:

_____
RAYE, P. J.

_____
MURRAY, J.

37